UNITED STATES of America, Appellee,

v.

Gaetano NAPOLI, Defendant–Appellant.

No. 802, Docket 94–1303.

United States Court of Appeals,
Second Circuit.

Argued Jan. 20, 1995.

Decided April 19, 1995.

John M. Apicella, Brooklyn, NY, for defendant-appellant.

Charles E. Rose, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., E.D.N.Y., Susan Corkery, Emily Berger, Asst. U.S. Attys., of counsel), for appellee.

Before: NEWMAN, Chief Judge,
MINER, Circuit Judge, and KAPLAN,
District Judge.*

MINER, Circuit Judge:

Defendant-appellant Gaetano Napoli appeals from a judgment of conviction and sentence entered on May 24, 1994 in the United States District Court for the Eastern District of New York (Sifton, J.) following his plea of guilty to one count of bank fraud, in violation of 18 U.S.C. § 1344. The district court sentenced Napoli to a 43–month term of imprisonment, a three-year term of supervised release, a $10,000 fine, restitution of $446,-734.66, and a $50 special assessment.

On appeal, Napoli challenges the district court's decision to depart upward from the Sentencing Guidelines. Although Napoli pleaded guilty to, and was convicted of, the offense of bank fraud, the district court believed that Napoli's criminal conduct also established the more serious offense of domestic money laundering, in violation of 18 U.S.C. § 1956(a)(1). The district court therefore departed upward 10 levels from the fraud guideline, U.S.S.G. § 2F1.1, using the money laundering guideline, U.S.S.G. § 2S1.1, as its guidepost. For the reasons that follow, we conclude that the district court's factual findings are not sufficient to establish the offense of money laundering or to take this case from the heartland of the fraud guideline. Accordingly, we vacate the

---

* The Honorable Lewis A. Kaplan of the United States District Court for the Southern District of New York, sitting by designation.

sentence imposed by the district court and remand for resentencing.

## BACKGROUND

In late 1992, Napoli and eleven co-defendants were indicted on charges of money laundering, bank fraud, and conspiracy. On June 30, 1993, Napoli entered into a plea agreement with the government under which he agreed to plead guilty to one count of bank fraud, and, in exchange, the government agreed that it would not move for an upward departure from the Sentencing Guidelines and that it would not contest the Probation Department's recommendation that Napoli receive a three-level reduction in his offense level for acceptance of responsibility. The plea agreement also set forth the government's estimate of Napoli's total offense level. The government estimated that Napoli would be sentenced at an offense level of either 11 or 13, depending on whether the sentencing court found that Napoli's role in the offense was minor, *see* U.S.S.G. § 3B1.2(b).

According to the government, the conspiracy for which Napoli and his co-defendants were indicted was instigated by Salvatore Caruso and managed by Caruso and Dr. Ronald Gordon. It was designed to operate as follows: (a) Andrew Amato, Joseph Ruffalo and others would acquire cancelled and/or stolen blank checks; (b) Patrick Carosone and Anthony Conte would counterfeit the checks and make them out to fictitious names; and (c) Orlando Reyes and unknown associates would take the checks to Switzerland, deposit them, and transfer the proceeds back to the United States. After Reyes repeatedly failed to negotiate any of the fraudulent checks, Caruso and Gordon turned to Wayne Odom, Basil Chase, and Arthur Endes ("the Odom group") to cash checks in Texas and Mexico. The Odom group, with the help of Napoli, was able to cash a small number of checks, stolen from the Toplis & Harding insurance company, at a Texas bank and obtain approximately $500,000. Shortly thereafter, Odom and Gordon were arrested,

and both men agreed to cooperate with the government. With their assistance, the remaining conspirators were arrested. Each pleaded guilty, except for Reyes, who was convicted after a jury trial at which Judge Sifton presided.

During his plea proceeding, Napoli admitted that he participated in negotiating the Toplis & Harding checks. Napoli claimed, however, that his involvement in the scheme was limited to assisting Caruso in collecting the proceeds of the checks from the Texas bank where they were deposited. In return for his participation in the scheme, Napoli was to receive a portion of the funds collected from the bank.

After receiving objections to the original presentence report ("PSR") from both Napoli and the government, the Probation Department prepared an amended PSR that calculated a total offense level of 11. The calculation consisted of a base offense level of six, pursuant to U.S.S.G. § 2F1.1, a 10–level enhancement based on the more than $500,000 in checks deposited in the Texas bank, a three-level reduction for acceptance of responsibility, and a two-level reduction for Napoli's minor role in the offense. With a criminal history category of I, Napoli's estimated offense level of 11 resulted in a guidelines range of 8 to 14 months.

At sentencing hearings on January 14 and February 18, 1994, the district court expressed some concern over the disparity between Napoli's guidelines range and the longer prison sentences received by his co-conspirators, whose criminal conduct encompassed international money laundering, in violation of 18 U.S.C. § 1956(a)(2).[1] The court therefore requested additional information about Napoli's involvement in the conspiracy, noting that the evidence adduced at co-defendant Reyes' trial was not in accord with Napoli's denial that he was the source of the stolen Toplis & Harding checks nor with Napoli's characterization of his role in the scheme as "minor or minimal." The court also noted that application note 13 to U.S.S.G. § 2F1.1, the fraud guideline, con-

---

**1.** The government at this point conceded that Napoli's involvement with the Toplis & Harding checks was purely domestic and therefore that

the international money laundering statute was inapplicable.

templated circumstances in which the defendant's criminal conduct is more aptly covered by another guideline,[2] and the court questioned counsel as to whether Napoli might be sentenced under U.S.S.G. § 2S1.1, the guideline for money laundering. The hearings were adjourned to allow for written submissions by counsel.

At Napoli's May 11, 1994 sentencing hearing, the court began by stating that it would not directly apply the money laundering guideline in this case. The court recognized that applying section 2S1.1 would be improper, because the facts establishing Napoli's violation of the money laundering statute were not contained in the count of the indictment to which Napoli pleaded guilty. *See* U.S.S.G. § 2F1.1 appl. note 13. Rather, the court stated its inclination to depart upward from the guidelines on the ground that "the offense we're dealing with" is domestic "money laundering of the type covered by [18 U.S.C. §] 1956(a)(1)." The court reasoned that Napoli's conduct was "designed to conceal the ... nature and origin" of the Toplis & Harding checks by "taking a stolen check, and then putting it in the hands of these specialists, or at least [people] they thought to be specialists." This, the court believed, was "much more fairly characterized as money laundering than bank fraud."

After hearing argument from counsel on this issue, the court imposed sentence on Napoli. Applying § 2F1.1, the fraud guideline, the court began with a base level of six, added 10 levels on account of the more than $500,000 loss, and then subtracted three levels for Napoli's acceptance of responsibility. The court declined Napoli's request for a reduction on account of his minor role in the offense. This resulted in an offense level of 13 and a guidelines range of 12 to 18 months. On its own motion, the court departed upward from the fraud guideline. Judge Sifton explained that

> the exceptional circumstances presented by this case ... reveal that what is essentially involved here is laundering stolen checks rather than ... bank fraud.

> I'm persuaded of this because it appears clear to me on all of the information before me that ... the effort was to find someone at a considerable remove from Mr. Napoli, who was not simply a specialist in getting rid of checks of large dimensions, which might make it just a bigger bank fraud than the usual bank fraud, but ... [s]omeone who would be able to ... launder the money so that the portion that came back to Mr. Napoli would not be traced to him or to the people who had stolen the checks.

In determining the extent of the departure, Judge Sifton departed by analogy to the money laundering guideline. Section 2S1.1, the sentencing guideline for money laundering, provides a base offense level of 23, with three additional levels added on account of the amount of funds "laundered" by Napoli. From this, the court subtracted three levels for acceptance of responsibility, leaving an adjusted offense level of 23 under the money laundering guideline. By sentencing Napoli on the basis of an offense level of 23, the district court departed upward 10 levels from the total offense level that Napoli would have received under the fraud guideline.

## DISCUSSION

On appeal, Napoli challenges only the upward departure imposed by the district court. He argues that the court erred in sentencing him in accordance with the money laundering guideline when his criminal conduct did not establish the offense of money laundering. He also argues that his criminal conduct was well within the "heartland" of the fraud guideline, and a departure from that guideline therefore was improper.

A sentencing court can depart from a guidelines range when it "finds that there exists an aggravating or mitigating circum-

---

2. Application Note 13 to U.S.S.G. § 2F1.1 explains that the fraud guideline embraces a wide range of criminal conduct. For that reason, it instructs the sentencing court as follows:

> Where the indictment or information setting forth the count of conviction ... establishes an offense more aptly covered by another guideline, apply that guideline rather than § 2F1.1. Otherwise, in such cases, § 2F1.1 is to be applied, but a departure from the guidelines may be considered.

stance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b). In *United States v. Skinner*, 946 F.2d 176 (2d Cir.1991), we explained:

> [T]he sentencing court should regard each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case ... where conduct significantly differs from the norm, the court may consider whether a ... departure is warranted.

*Id.* at 179 (quoting U.S.S.G. Ch. 1, Part A, 4(b)). Allowing departures from the guidelines ensures that "atypical cases are not shoe-horned into a Guidelines range that is formulated only for typical cases." *United States v. Rogers*, 972 F.2d 489, 493 (2d Cir. 1992).

In analyzing the appropriateness of an upward departure, this court makes three separate inquiries. First, we examine *de novo* whether the factors relied upon by the sentencing court are permissible bases for a departure. *See id.* at 492. Second, we review the factual findings of the sentencing court for clear error. *See United States v. Stroud*, 893 F.2d 504, 506–07 (2d Cir.1990). Finally, we consider whether or not the departure is reasonable. *See United States v. Mora*, 22 F.3d 409, 413 (2d Cir.1994).

The guideline for bank fraud, U.S.S.G. § 2F1.1, is somewhat unusual in that it specifically recognizes that a departure may be appropriate for certain types of offense conduct. Application note 13 to § 2F1.1 explains that the fraud guideline encompasses a wide range of criminal conduct, and, in certain cases, the defendant's criminal conduct may be so far removed from a typical fraud offense that mechanical application of § 2F1.1 may not result in a proper sentence. An example given by the application note posits a defendant who commits state-law arson and then mails a fraudulent claim to his or her insurer. While such a defendant may be convicted of mail fraud in the federal courts, the defendant's conduct is far removed from that found in a typical fraud offense. For this reason, the application note instructs the sentencing court as follows:

> Where the indictment or information setting forth the count of conviction ... establishes an offense more aptly covered by another guideline, apply that guideline rather than § 2F1.1. Otherwise, in such cases, § 2F1.1 is to be applied, but a departure from the guidelines may be considered.

U.S.S.G. § 2F1.1 appl. note 13.

The first quoted sentence directs the sentencing court to directly apply a guideline other than § 2F1.1 in cases in which the elements of another offense can be established from the indictment or information setting forth the count of conviction. *See United States v. Paccione*, 949 F.2d 1183, 1203–04 (2d Cir.1991). This is consistent with U.S.S.G. § 1B1.2, which generally requires the sentencing court to use the guideline associated with the offense of conviction. *See id.; see also* U.S.S.G. § 1B1.2(a) (in determining applicable guideline, where plea agreement "establishes a more serious offense than the offense of conviction, determine the offense guideline ... most applicable to the stipulated offense"); U.S.S.G. Appendix C, Amendment 155 (application note 13 to § 2F1.1 (formerly note 15) amended so that it "is interpreted in a manner consistent with § 1B1.2"). However, reliance on a guideline other than § 2F1.1 would have been inappropriate in this case, since, as the district court correctly recognized, the count of the indictment to which Napoli pleaded guilty does not establish the offense of money laundering.

The latter portion of application note 13 addresses the more common situation where facts outside the indictment or information are relied upon to "establish[ ] an offense more aptly covered by another guideline." In such cases, the sentencing court is to apply the fraud guideline, but it may consider a departure. We understand this provision to mean that a sentencing court may depart from the offense level established by § 2F1.1 when it finds, based on all information known to it, *see United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 163, 126

L.Ed.2d 124 (1993), that the defendant has committed another criminal offense for which he or she has not been convicted and that that offense is covered more aptly by another guideline.

Of course, even when the elements of a more serious offense cannot be established, the defendant's criminal conduct still may, in certain rare cases, lie well beyond the "heartland" embodied in the fraud guideline and thereby warrant a departure. For example, in *United States v. Paccione*, we recognized that the Sentencing Commission, in formulating the fraud guideline, did not contemplate the possibility of "massive environmental damage" caused by the mail-fraud defendants, and an upward departure therefore would have been appropriate. *See* 949 F.2d at 1205.

Here, the district court found that "the exceptional circumstances presented by this case ... reveal that what is essentially involved here is laundering stolen checks rather than ... bank fraud." For this reason, the court chose to depart from the fraud guideline by analogy to the money laundering guideline. In so doing, the district court placed explicit reliance on the last sentence of application note 13. We therefore must determine whether the district court properly found that Napoli's conduct established an offense more aptly covered by another guideline.

The domestic money laundering statute, 18 U.S.C. § 1956(a)(1),[3] prohibits financial transactions that "involve[ ] the proceeds of specified unlawful activity." Section 1956(a)(1) "requires first that the proceeds of specified unlawful activity be generated, and second that the defendant, knowing the proceeds to be tainted, conduct or attempt to conduct a financial transaction with these proceeds." *United States v. Piervinanzi*, 23 F.3d 670, 679–80 (2d Cir.1994). The financial transaction must be conducted with the intent to promote a specified unlawful activity or with the knowledge that the transaction is designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds. 18 U.S.C. § 1956(a)(1). In this case, the district court determined that Napoli had participated in the financial transaction "to conceal the ... nature and origin of stolen [Toplis & Harding] check[s]." Thus, it appears that, in the district court's view, the specified unlawful activity was theft, the checks were the proceeds of theft, and the cashing of the checks at the Texas bank was a financial transaction involving the proceeds of the theft.

At the outset, it is clear that the negotiation of fraudulent checks was a financial transaction within the meaning of section 1956. The term "financial transaction" encompasses transactions that involve: (1) the movement of funds by wire or other means; (2) monetary instruments (including checks); (3) the transfer of title to certain types of property; and (4) the use of financial institutions. 18 U.S.C. § 1956(c)(4), (5). By negotiating the stolen checks (or assisting therein), Napoli clearly engaged in a financial transaction within the meaning of section 1956. We therefore must determine whether the transaction involved the proceeds of a specified unlawful activity.

The term "specified unlawful activity" is defined broadly by 18 U.S.C. § 1956(c)(7), and encompasses a considerable number of federal crimes. This provision also incorporates by reference almost all of the crimes described in 18 U.S.C. § 1961(1), an enumeration of the predicate acts of racketeering

---

**3.** Section 1956(a)(1) provides:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine ... or imprisonment. ...

under the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1961 *et seq.* However, despite the broad range of criminal offenses designated by the money laundering statute, the crime of theft, standing alone, is not a specified unlawful activity. It is neither a federal crime listed in sections 1956 and 1961, nor one of the state-law offenses that constitute RICO predicate acts. Thus, engaging in a domestic financial transaction with the proceeds of a simple theft is not money laundering within the definition of 18 U.S.C. § 1956(a)(1).

While bank fraud, the crime for which Napoli was convicted, is listed as a specified unlawful activity, it could not be considered the source of "proceeds" in this case. The two-step analytical process required by the domestic money laundering statute requires the defendant to (1) acquire the proceeds of a specified unlawful activity, and then (2) engage in a financial transaction with those proceeds. *See Piervinanzi,* 23 F.3d at 679–80.[4] Since the proceeds of Napoli's bank fraud were realized only when the fraudulent checks were successfully negotiated at the Texas bank, only the first of the two steps would be satisfied if the fraud on the Texas bank were considered the specified unlawful activity. There is no evidence that Napoli engaged in any further financial transactions involving the proceeds of the bank fraud and thus no evidence that the proceeds of the bank fraud were laundered.

In view of the district court's failure to identify an unlawful activity specified by section 1956, we do not reach the more interesting question whether the stolen Toplis & Harding checks themselves could be said to represent the "proceeds" of a specified unlawful activity.[5] Nor do we reach the issue whether the checks were cashed with the intent "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," as the district court found, or "with

the intent to promote the carrying on of specified unlawful activity," as the government contended at oral argument. Since the district court's factual findings do not "establish[ ] an offense more aptly covered by another guideline," we conclude that the court's upward departure pursuant to application note 13 cannot be sustained on the record before us.

■ Finally, we address the question of whether Napoli's conduct, even if outside the contours of the money laundering statute, was sufficiently akin to money laundering to justify the court's upward departure. As discussed above, a sentencing court may depart from the guidelines in the atypical case where the defendant's conduct falls well outside the heartland of conduct that a particular guideline encompasses. *See Skinner,* 946 F.2d at 179. In this case, we believe that Napoli's conduct was well within the heartland of the fraud guideline and that a departure on this ground would not be warranted.

The statute under which Napoli pleaded guilty, 18 U.S.C. § 1344, provides: "Whoever knowingly executes, or attempts to execute, a scheme or artifice to defraud a financial institution" is guilty of bank fraud. With respect to Napoli, the scheme to defraud involved depositing fraudulent checks in a Texas bank and later collecting the deposited funds. In our view, this is a fairly typical case of bank fraud. While the district court appears to have harbored suspicions that Napoli had some responsibility for acquiring the fraudulent checks, it made no specific findings in this regard and our review of the record indicates that there was minimal evidence on this point.

In stating its reasons for the departure, the district court appears to have placed a great deal of significance on the fact that the conspirators chose to negotiate the fraudulent checks in a distant part of the country. We do not, however, believe that this factor

---

4. This two-step process is not required with respect to the offense of international money laundering. *See Piervinanzi,* 23 F.3d at 679–82.

5. While the conspirators may have engaged in criminal conduct specified by section 1956 relating to the Toplis & Harding checks, the district

court did not identify any such conduct, and we are reluctant to do so in the first instance. In this connection, we note that identification of the specified unlawful activity would have a significant bearing on whether the checks can be considered the "proceeds" of that conduct.

takes Napoli out of the heartland of the fraud guideline. The conspirators' use of a remote bank, apparently for the purpose of facilitating the successful negotiation of the checks and to escape detection, is not conduct that, in our view, significantly differs from a normal fraud case. In sum, we believe that this case falls well within the heartland of the fraud guideline.

## CONCLUSION

For the foregoing reasons, we conclude that the district court's factual findings are insufficient to sustain its upward departure. We therefore vacate the sentence imposed on Napoli, and remand for further proceedings consistent with this opinion.