Robert ZIGMAN, individually and on behalf of Finish Line Collision, Inc. and Finish Line Too, Inc., Plaintiffs,

v.

Michael GIACOBBE, Alyssa Dawn Giacobbe, Demetrio Giacobbe, Emil H. Schaefer, and Bobbie E. Gingold, Defendants.

No. CV 96–1396 (ADS).

United States District Court, E.D. New York.

Oct. 12, 1996.

and warrants imposition of a constructive trust.

Murray & Hollander by Guy L. Heinemann, New York City, for Plaintiffs.

Brafman Gilbert & Ross, P.C. by Brett Gilbert, New York City, for Defendants Michael Giacobbe and Alyssa Dawn Giacobbe.

Capetola & Doddato by Anthony A. Capetola, Williston Park, NY, for Defendant Demetrio Giacobbe.

Richard S. Naidich, Bellmore, NY, for Defendants Emil H. Schaefer and Bobbie E. Gingold.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge:

This lawsuit arises from the claims of the plaintiff, Robert Zigman (the "plaintiff" or "Zigman"), that the defendants have been "systematically looting" certain corporations in which he and several of the defendants maintain interests. According to Zigman, the defendants have deprived him of over $1.8 million in profits "principally by ... laundering vast amounts of income" through unrelated business entities. The plaintiff alleges that the defendants' unlawful conduct violates the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961–68 and New York Business Corporation Law §§ 626, 706(d), 716(c), 720, 1104 and 1202, and gives rise to common law claims for fraud, breach of contract, breach of fiduciary and other unidentified duties,

## I. Background

The following facts are taken from the Complaint. The plaintiff, Robert Zigman is a resident of East Rockaway, New York and from July 1988 until May 1989 was married to the defendant Alyssa Dawn Giacobbe ("Alyssa"). The defendant Michael Giacobbe ("Michael") resides in Woodbury, New York and has been married to Alyssa since September 1993. The defendant Demetrio Giacobbe ("Demetrio") is a resident of Plainview, New York and is Michael's brother (collectively the "Giacobbes"). The defendant Emil H. Schaefer ("Schaefer") is a resident of Sands Point, New York and owns "Bay Bootery," a business located in Port Washington, New York. The defendant Bobbie Gingold ("Gingold") resides in Great Neck, New York and is Alyssa's mother.

In April 1992 Alyssa introduced Zigman to Michael for the purposes of opening and operating an auto body and repair shop in Valley Stream, New York. According to the Complaint, in June 1992 the plaintiff entered into a partnership (the "Body Shop Partnership") with Michael and Michael's brother Demetrio. According to the terms of the partnership agreement Zigman would invest $15,000 in cash and $17,000 in equipment in the business and was entitled to 35 percent of the profits. Michael was entitled to 35 percent of the profits and Demetrio was to receive the remaining 30 percent. In support of this allegation Zigman attaches to the Complaint a handwritten, unsigned, and undated page from what appears to be a calendar which states each partner's interest. Alyssa was to act as the partnership's bookkeeper and "de facto" treasurer.

On June 26, 1992, the parties incorporated Finish Line Collision, Inc. "Finish Line 1," the nominal owner of a body shop located in Valley Stream, New York. On June 21, 1993, the parties incorporated Finish Line Too, Inc. as the nominal owner of a body shop located in Garden City Park, New York. Apparently, both of these body shops do

business under the name "Finish Line Collision."

According to the plaintiff, since 1992, the Giacobbes "took control of all of the corporate bookkeeping and accounting for Finish Line 1, and later Finish Line Too," and advised him that all income was necessary to meet expenses, thereby leaving no profit. In reality however, states Zigman, the Giacobbe defendants "concealed from [the p]laintiff the true amount of gross income and profits being earned by both body shops and, therefore, the Body Shop Partnership. Instead, [they] diverted income from the business bank accounts and aggregated to themselves substantial sums . . . instead of sharing the profits [as previously] agreed to."

Zigman alleges that the Giacobbes would negotiate checks constituting claims payments from insurance companies or personal checks from customers through the bank accounts of third parties such as Bay Bootery, owned by defendant Schaefer. The customers' checks would be endorsed to a bank for Bay Bootery's account. Schaefer would then withdraw the money as cash, disburse it to Michael and Alyssa with a fee deducted to pay for Schaefer's assistance. As evidence of these transactions, Zigman alleges that between June 1992 and October 1995, and continuing thereafter, monthly bank statements reflect credits to Bay Bootery's account representing checks for "substantial sums" which were otherwise payable to the Body Shop Partnership. Further, on March 14, 1995, Michael and Alyssa caused a company referred to only as Traina Enterprise, Inc. to mail a check in the amount of $1,080, apparently for some type of automotive repair "to Michael Giacobbe to Finish Line Too." The check was then deposited in a Bay Bootery account. Similar schemes were used with the businesses' vendors including companies referred to as "American Auto Body Supplies" and "Albert Kemperle Auto Body Supplies, Inc.," although no specific examples with respect to these third parties are alleged.

In addition, Michael and Alyssa have used the bank account of Alyssa's mother, Bobbie Gingold to conceal income from the plaintiff. For example, according to Zigman, on January 24, 1996, Alyssa transferred an amount in excess of $20,000 to Gingold's bank account in order to conceal the money. Then on January 30, 1995, "Gingold caused a check to be issued by Aetna for repairs to a Lincoln automobile and thereafter caused said check for over $7,000 to be negotiated in a manner that the Body Shop Partnership and Finish Line did not receive the funds."

Similarly, according to the Complaint, Demetrio would have customers make checks out to him personally so that the money could be diverted from the Body Shop Partnership. For example, on December 3, 1993, Demetrio requested that a customer, referred to as Kathleen Kerr, pay a repair bill in the sum of $8,973.28 by a check payable to him personally. The check was then deposited in Demetrio's personal account in National Westminster Bank ("NatWest"). On April 15, 1994 Demetrio requested that a second customer referred to only as "Shane" pay for automotive services by a check for $1,000 payable to cash. This check was also deposited directly into Demetrio's NatWest account. On September 23, 1994, Demetrio had a third customer referred to as Beatrice Levine pay for services with a check made out to cash which was never deposited into a Finish Line Collision account.

Examples of Michael's alleged unlawful conduct include similar diversions. According to the Complaint, Michael maintained an "unusually close relationship with supervising adjusters at Federal Insurance Company." This relationship allowed him to obtain payment checks directly which he then negotiated to third parties "outside of the business accounts." According to Zigman, in September 1993, Michael and Alyssa processed a "flood damage claim" with Federal using false invoices of Graham Restoration Company. On May 11, 1994, Michael and Alyssa caused Federal Insurance Company to mail a check to Finish Line Collision jointly with Ford Motor Company. In July 1995 Michael caused an agent of Federal to mail an "approved estimate" authorizing the payment of over $27,000 in repairs to a "late model Mercedes" at Finish Line Too. On July 10, 1995 Federal issued a check in the amount of $27,796.37 for repairs to the Mercedes. The

check however, was payable to a company identified only as Bristol Manor.

Although Zigman admits that he has been unable to obtain all of the financial records from Finish Line 1 and Finish Line Too, given the records he does have, he estimates that the profits unreported to him amount to over $1.8 million. According to the plaintiff this "wide scale embezzlement" permitted Michael and Alyssa to purchase a "large" home in Woodbury, a second home in Port Washington and lease "expensive" cars. Further, Zigman alleges that a third body shop, "Finish Line 3" was incorporated by the Giacobbe's on October 31, 1995. Although the plaintiff alleges that he has no involvement with this third shop, he contends that it was established with the proceeds from the first two locations.

In addition to these concealments, the plaintiff alleges that the defendants also made several unlawful misrepresentations to him in violation of their fiduciary obligations as "de facto" officers, agents and co-owners of closely held corporations, including their duty to disclose all relevant financial information and their duty of loyalty. These alleged misrepresentations include the following:

1. During the period from June 1992 throughout 1994, Alyssa continually misrepresented that the business was not making any profit.

2. In June 1993, Michael, in the presence of Demetrio, advised Zigman that Finish Line 1 was in such financial distress that the business would "have to be closed down."

3. In October 1993, Alyssa advised the plaintiff that Finish Line Too would have to "produce more income to be able to survive."

4. In March 1994 Alyssa informed Zigman that Finish Line Too was "paying ... the bills for Finish Line 1."

5. Also in March 1994 Michael and Alyssa represented that the business was in such distress that the plaintiff would have to use his own automobile for business purposes.

6. In January or February 1995, Alyssa stated that she had never misrepresented the companies' finances despite the evidence to the contrary.

7. In April 1995 Michael, while considering a site for a third shop with the plaintiff, stated that there was no money available from the other shops to open a third shop and that he and the plaintiff would have to lay out the money themselves.

According to the plaintiff, these "misrepresentations" were made by the Giacobbes "for the purpose of misleading Plaintiff and unlawfully enriching themselves."

Based on these contentions, the plaintiff alleges multiple causes of action for violations of RICO, 18 U.S.C. §§ 1961–68, New York Business Corporations Law §§ 626, 706(d), 716(c), 720, 1104–a, 1202, and common law claims for fraud, breach of contract, breach of fiduciary and "other" unidentified duties, and seeks imposition of a constructive trust. Zigman seeks, compensatory damages, punitive damages, treble damages, costs, attorneys' fees and equitable relief including an accounting, removal of the defendants as directors and officers of the Finish Line corporations and an injunction prohibiting their re-election or re-appointment, dissolution of the Finish Line corporations, and imposition of a constructive trust.

The defendants have filed a single motion to dismiss pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) for failure to plead fraud with the required particularity and for failure to state a claim upon which relief can be granted. The plaintiff opposes the motion, arguing that his claims are adequately pled. In the alternative, the plaintiff moves for leave to replead pursuant to Fed.R.Civ.P. 15(a) in the event that the defendants' motion is granted.

II. *Discussion*

A. *The standard*

On a motion to dismiss for failure to state a claim, "the court should not dismiss the complaint pursuant to Rule 12(b)(6) unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'". *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.

1985), quoting, *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *see also IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052–53 (2d Cir.1993). The Second Circuit stated that in deciding a Rule 12(b)(6) motion a Court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken". *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993); *see also Rent Stabilization Ass'n of the City of New York v. Dinkins,* 5 F.3d 591, 593–94 (2d Cir.1993), citing *Samuels,* 992 F.2d at 15.

It is not the Court's function to weigh the evidence that might be presented at a trial, the Court must merely determine whether the complaint itself is legally sufficient, *see Goldman,* 754 F.2d at 1067, and in doing so, it is well settled that the court must accept the allegations of the complaint as true, *see LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Procter & Gamble Co. v. Big Apple Indus. Bldgs, Inc.,* 879 F.2d 10, 14 (2d Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990), and construe all reasonable inferences in favor of the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1099 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).

In addition to the foregoing standard governing Rule 12(b)(6) motions, the Court must be mindful of the relevant rules of pleading. In general, a plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), and that "[a]ll pleadings shall be so construed as to do substantial justice". Fed.R.Civ.P. 8(f). However, because the RICO claims at issue are based in part on allegations of mail fraud, the more stringent requirements of Rule 9(b) apply to these allegations, requiring that "all averments of fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b).

### B. *The plaintiff's claims*

The defendants move to dismiss the causes of action based on alleged RICO violations under 18 U.S.C. § 1962. The threshold pleading requirements of a private action under § 1962 were set forth by the Second Circuit in *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984), as follows:

> To state a claim for damages under RICO a plaintiff has two pleading burdens. First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 (1976), commonly known as 'criminal RICO.' In so doing, he must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce.... Plaintiff must allege adequately defendant's violation of section 1962 before turning to the second burden—*i.e.,* invoking RICO's civil remedies of treble damages, attorneys fees and costs.... To satisfy this latter burden, plaintiff must allege that he was 'injured in his business or property by reason of a violation of section 1962.' " *Id.* at 17 (citations omitted).

The defendants attack the Complaint under the second element set forth above, namely that the plaintiff has failed to sufficiently allege two or more predicate acts sufficient to support a cause of action under RICO. The Complaint alleges essentially three separate categories of predicate acts: (1) mail fraud; (2) bribery; and (3) money laundering.

#### 1. *Mail fraud*

■ As this Court has recognized in the past, predicate acts based on some type of fraud, such as mail fraud must meet the more rigorous pleading requirements set forth under Fed.R.Civ.P. 9(b). *See, e.g., Morrow v. Black,* 742 F.Supp. 1199, 1203 (E.D.N.Y.1990) (recognizing the applicability of Rule 9(b) under such circumstances). Rule 9(b) provides:

In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

■ One of the primary purposes of the specificity requirement of Rule 9(b) "is to insure that the defendant receives fair notice of plaintiff's claim, and is thus able to prepare a defense," *Hutton v. Klabal*, 726 F.Supp. 67, 72 (S.D.N.Y.1989), *citing, Di Vittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987), as well as to protect a defendant's reputation and to avoid strike suits. *See Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir.1990); *Philan Ins., Ltd. v. Frank B. Hall & Co.*, 712 F.Supp. 339, 342 (S.D.N.Y.1989); *United States v. Rivieccio*, 661 F.Supp. 281, 290 (E.D.N.Y. 1987). To satisfy the particularity requirement of Rule 9(b), the allegations should "specify the time, place, speaker, and content of the alleged misrepresentations." *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir.1993); *Di Vittorio*, 822 F.2d at 1247, *citing, Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986). "These concerns are even more immediate in civil RICO actions, because such suits 'implicate the reputation interests of defendants accused of committing racketeering offenses.'" *Atlantic Gypsum Co., Inc. v. Lloyds International Corp.*, 753 F.Supp. 505, 512 (S.D.N.Y.1990) (quotation omitted). However, "[b]ecause it would be unrealistic to expect a plaintiff to read a defendant's actual state of mind, ... [Rule] 9(b) permits plaintiffs to allege fraudulent intent generally while the circumstances amounting to fraud must be averred with particularity." *Powers v. British Vita P.L.C.*, 57 F.3d 176, 184 (2d Cir.1995).

■ If multiple defendants are involved in the alleged fraud, it is especially important that the fraud be particularized as to each one of them. *See, e.g., Lou v. Belzberg*, 728 F.Supp. 1010, 1022 (S.D.N.Y.1990); *United States v. Rivieccio, supra; Laterza v. American Broadcasting Co.*, 581 F.Supp. 408, 413 (S.D.N.Y.1984). However, specific connection need not necessarily be made between the fraudulent representations and the spe-cific defendants where the defendants are insiders. *Di Vittorio*, 822 F.2d at 1247.

■ Mail fraud, as set forth in 18 U.S.C. § 1341 is among those predicate acts incorporated in the RICO statute. *See* 18 U.S.C. § 1961(1)(B). The Second Circuit has recently reiterated that three elements are necessary to establish a claim for mail fraud: (1) a scheme or artifice to defraud; (2) for the purpose of obtaining money or property (or of depriving another of the intangible right of honest services); and (3) use of the mails in furtherance of the scheme. *United States v. Altman*, 48 F.3d 96, 101 (2d Cir. 1995). A scheme to defraud refers to the "'deprivation of something of value by trick, deceit, chicane, or overreaching.'" *Id.* at 102, citing, *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). The use of the mails need not be essential to the fraudulent scheme as long as the mailing is incident to an essential part of the scheme. *Id.*, citing, *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954). The defendant must act with the knowledge that use of the mails will follow in the ordinary course of business or can reasonably be foreseen even though not intended. *Id.*

Applying these standards the defendants argue that the allegations of mail fraud in the Complaint are insufficient as a matter of law because they fail to meet Fed.R.Civ.P. 9(b) strict pleading requirements. Further, according to the defendants, the Complaint fails to relate the mailings alleged to any fraudulent scheme.

■ Beginning with the first element set forth above, the Court finds that the Complaint sufficiently alleges a scheme to defraud as required by Rule 9(b). The plaintiff specifically alleges that in 1992, he entered into a business relationship with Michael and Demetrio for the purpose of opening and maintaining automotive repair and body shops. Michael's wife Alyssa would be responsible for administration of the finances. In return for the plaintiff's investment of cash and equipment he would be entitled to 35 percent of the profits. This partnership then opened two body shops, one in Valley

Stream and the other in Garden City Park for this purpose.

However, in an effort to avoid paying Zigman his share, it is alleged that the Giacobbes engaged in an elaborate scheme to conceal the business's income. According to the Complaint, between 1992 and 1995 and continuing thereafter, the Giacobbe defendants would divert business income for services rendered into the bank accounts of unrelated parties. For example, the Giacobbes would have checks written to them personally, or to cash, rather than the body shops. They would then endorse these checks as necessary to third parties, such as Schaefer, the owner of Bay Bootery, or Alyssa's mother, who would then return the money in cash.

In support of this scheme, the plaintiff alleges many specific acts, which when taken together, satisfy the stringent pleading requirements of Fed.R.Civ.P. 9(b). As stated above, Zigman alleges that on December 3, 1993 Demetrio requested that a customer Kathleen Kerr pay for repairs with a check in the amount of $8,973.28 made out to him personally. The check was deposited in Demetrio's NatWest account. On April 15, 1994, Demetrio requested that a second customer, "Shane," make a check payable to cash in the amount of $1,000 for services rendered. This check also was deposited in Demetrio's personal account at NatWest Bank. On September 23, 1994 Demetrio had a third customer, Beatrice Levine pay for auto repair services with a check also made out to cash. This check was never deposited to a Finish Line Collision account. On January 30, 1995, Gingold caused a check for over $7,000 issued by Aetna for repairs to a Lincoln performed by one of the Finish Line shops to be diverted away from the body shop's accounts. On January 24, 1996, Alyssa transferred more than $20,000 to her mother's bank account in an effort to conceal business income. The Complaint further alleges that in June 1993, October 1993, March 1994 and January or February 1995, Michael and Alyssa repeatedly represented to the plaintiff that the body shops were in financial distress when in reality they had made a total of $1.8 million dollars in profit, none of which was distributed to the plaintiff.

Taken as a whole, these allegations clearly satisfy the time, place, speaker and content requirements for pleading fraud claims under Rule 9(b). The Complaint alleges a general scheme to defraud the plaintiff of his share of the business profits and then specifies the time, place, actor, and nature of each of the defendant's fraudulent transaction. These allegations are sufficiently specific to put each named defendant on notice of his or her unlawful activity alleged.

█ With respect to the second element of mail fraud, the defendants do not challenge that the unlawful conduct alleged was for any purpose other than obtaining money or property. Accordingly, the only remaining element for the Court to consider is whether the mails were used in the furtherance of the alleged fraudulent scheme.

As stated above, use of the mails need not be an essential component of the fraudulent scheme as long as its use is incident to an essential part of the scheme. *Altman,* 48 F.3d at 102. With respect to the mailings in furtherance of the scheme, Zigman makes five separate allegations:

A. From in or about June of 1992, up through approximately October of 1995, and continuing thereafter, the Giacobbe defendants and Schaefer caused monthly statements to be mailed regularly to Bay Bootery, Port Washington, New York, from a NatWest Bank central office, which contained credits to Bay Bootery's account of substantial sums from deposited checks otherwise payable to or belonging to the Body Shop Partnership which had been endorsed over to Bay Bootery by the Giacobbe defendants.

B. On or about May 11, 1994, Michael and Alyssa caused Federal Insurance Company to mail a check in the amount of $7,137.10 payable to Finish Line Collusion jointly with Ford Motor Credit Company.

C. On or about March 14, 1995, Michael and Alyssa caused Traina Enterprise,

Inc., to mail a check in the amount of $1,080 made out to Michael Giacobbe to Finish Line Too, which check was thereafter deposited in the Bay Bootery account.

D. In or about July, 1995, Michael caused Thomas Lazarus of Federated Insurance Company to mail an approved estimate, authorizing the payment of over $27,000 for repairs to a late model Mercedes to Finish Line Too in Garden City Park.

E. On or about July 10, 1995, Michael caused Federal Insurance Company to issue and send through the mail a check payable to Bristol Manor in the amount of $27,796.37 for repairs to a Mercedes Benz automobile.

F. The defendants used or caused to used the mails on numerous other occasions, the precise dates of which are presently unknown.

Compl. ¶ 87.

Reviewing these allegations as a whole the Court finds that Zigman has sufficiently pled a single instance of mail fraud sufficient to support a RICO claim. *See Altman,* 48 F.3d at 103 (recognizing that a mailing must be sufficiently related to the fraudulent scheme to support a charge of mail fraud). In paragraph A, Zigman alleges that the defendants' fraudulent activity caused NatWest to mail Bay Bootery "monthly statements" which contained credits for checks that belong to the Body Shop Partnership. Assuming this to be true, as the Court must at this stage in the proceedings, Bay Bootery's monthly bank statements are not mailed in furtherance of the alleged fraudulent scheme and they are not incidental to an essential element of that scheme. Indeed, each allegedly fraudulent transaction had already concluded by the time the monthly statement was issued. Accordingly, those monthly statements will not support the plaintiff's mail fraud claim. *See id.* (recognizing that where the looting is complete before the mailing is made, a claim for mail fraud will not lie); *see also In re Gas Reclamation, Inc. Securities Litig.,* 663 F.Supp. 1123, 1125 (S.D.N.Y.1987) (recognizing that where the relationship to the mailing and the alleged fraudulent scheme is "at

best, highly attenuated" a RICO claim based thereupon will be dismissed).

Paragraphs B and C may be considered together. Both paragraphs allege that Michael and Alyssa caused checks to be mailed to Finish Line Collision, one jointly with the Ford Motor Credit Company and the other with Michael's name appearing with the business's which was deposited in a Bay Bootery account. The Complaint however does not allege the relationship between this mailings and the alleged fraudulent scheme, and as a result, will not support a claim for mail fraud. A check being mailed to Finish Line Collision and Ford Motor Company does not demonstrate furtherance of an unlawful scheme. Similarly, the fact that Traina Enterprise, who is not a party to this lawsuit, mailed a check to Michael, and then Michael subsequently converted the proceeds, does not give rise to a claim for mail fraud, nor is it in furtherance of the fraudulent scheme. There is nothing in the Complaint to indicate that Traina did not mail the check to pay a legitimate expense. Any unlawful activity transpired subsequent to and independent from the mailing of the check.

Paragraph D is apparently meant to be read with paragraph E although this is not entirely clear. In paragraph D the plaintiff alleges that in July 1995 Michael caused an insurance company to mail an approved estimate to the shop in Garden City Park. There is nothing to imply that this mailing was in furtherance of a fraudulent scheme. To the contrary, when read in conjunction with paragraph E, this mailing actually serves only to expose the alleged subsequent mailing of a check to a third party allegedly in an effort to defraud the plaintiff. Paragraph E alleges that later the same month, the same insurance company then mailed a check in an amount similar to that previously estimated to a third party, Bristol Manor. Reading these allegations in the light most favorable to the plaintiff, the Court finds that the mailing contained in paragraph E is consistent with and in furtherance of the fraudulent scheme described above, and accordingly will support a claim for mail fraud.

In reaching this conclusion, the Court's inquiry must continue because the Complaint

has only pled a single predicate act while two are required to support a claim under RICO. *See Moss, supra.* Paragraph F above, will not alter this conclusion as it contains no factual allegations sufficient to survive a motion to dismiss.

### 2. *Bribery*

■ Zigman's second category of predicate acts are based on bribery. *See* 18 U.S.C. § 1961(1)(A); N.Y.Penal Law §§ 70.00(2), (3), 180.03 (establishing that bribery may serve as predicate act in support of a RICO claim). The Complaint contains only three paragraphs relating to the alleged bribery and are restated below:

88. The acts and pattern of racketeering activity engaged in by defendants also included commercial bribing, in the first degree, in violation of New York Penal Law § 180.03, committed the following way.

89. The Giacobbe Defendants, acting individually and in concert, and aiding and abetting one another, wilfully and knowingly conferred and offered and agreed to confer a benefit upon various employees and agents of certain corporations, including insurance companies, without the consent of said companies, which were the employees' or agents' employers or principals, with intent to influence the conduct of said employees or agents in relationship to the affairs of said companies, as to *inter alia:* the delivery or mailing of the insurance company claims payments checks directly to the Giacobbe defendants, instead of their being sent to the insureds, thus enabling the Giacobbe defendants more easily to divert the proceeds of such check from the business accounts of Finish Line 1 and Finish Line Too.

90. The value of the benefits conferred and offered and agreed to be conferred by the [sic] Michael and Alyssa exceeded $1,000 on a number of occasions and the economic harm caused the insurance companies on all such occasions exceeded $250, in violation of New York Penal Law § 180.03. Such criminal conduct is a class E felony, punishable by a term of up to four years, pursuant to New York Penal Law § 70.00(2), (3), and therefore, is an offense involving bribery, chargeable under state law and punishable by imprisonment for more than one year, within the meaning of 18 U.S.C. § 1961(1)(A)

Compl. ¶¶ 88–90.

Reading these allegations in the light most favorable to the plaintiff, the Court finds that they fail to state a predicate act for bribery. In these three paragraphs there is not one single factual allegation of a specific bribe paid to any insurance agent at any time. Rather, paragraphs 88 through 90 constitute nothing more than vague, general and conclusory allegations insufficient to put a defendant on notice of any alleged wrongdoing. Accordingly, there is alleged no predicate act of bribery sufficient to support the plaintiff's RICO claims.

### 3. *Money laundering*

■ The final category of predicate acts alleged by the plaintiff is money laundering. *See* 18 U.S.C. § 1961(1); *Ray v. General Motors Acceptance Corp.,* 1995 WL 151852, CV 92–5043 (DGT) (E.D.N.Y. Mar. 28, 1995) (recognizing money laundering as a predicate act under RICO) Pursuant to 18 U.S.C. § 1956(a)(1):

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity;

    \*    \*    \*    \*    \*    \*

or

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity....

shall be [guilty of laundering monetary assets.]

■ The term "specified unlawful activity" is defined in section 1956(c)(7) and encompasses a considerable number of federal

crimes including most of the crimes listed in 18 U.S.C. § 1961(1), an enumeration of the predicate acts under RICO.

> However, despite the broad range of criminal offenses designated by the money laundering statute, the crime of theft, standing alone, is not specified unlawful activity. It is neither a federal crime listed in section 1956 and 1961, nor one of the state-law offenses that constitute RICO predicate acts. Thus engaging in a domestic transaction with the proceeds of a simple theft is not money laundering within the definition of 18 U.S.C. § 1956(a)(1).

*United States v. Napoli,* 54 F.3d 63, 68 (2d Cir.1995).

The defendants contend that the plaintiff has failed to state a claim for money laundering because the Complaint does not allege that the defendants attempted to conduct a financial transaction with the proceeds of a "specified unlawful activity." Rather, contend the defendants, "checks made payable to Finish Line or its customers ... were the proceeds of Finish Line's legitimate business operations—its repairing of automobile bodies."

Although the Court agrees with the defendants' conclusion, it does so for a different reason. As stated above, to allege a predicate act for money laundering, the proceeds must be from a "specified unlawful activity." The only unlawful activity specified in section 1956 that is adequately pled in the Complaint is the single count of mail fraud as discussed above in which a check from the Federal Insurance Company was mailed directly to a third party, "Bristol Manor," apparently for automotive repairs performed by one of the Finish Line Collision shops. There are however, no related allegations as to whether this money was "laundered" within the provisions of 18 U.S.C. § 1956. In fact, there are no other allegations as to what happened with this check. Accordingly, the Court finds that the plaintiff has failed to plead a predicate act of money laundering with respect to the one surviving count of mail fraud.

In reaching this conclusion, the Court further finds that although Zigman has alleged an elaborate scheme to defraud him of a substantial sum of money, this scheme, without related allegations of mail fraud, will not support a claim for money laundering. As the Second Circuit recognized in *Napoli,* the defendants' conversion of the plaintiff's share of the profits does not constitute a specified unlawful act under 18 U.S.C. § 1956. Accordingly, the Complaint fails to allege the predicate act of money laundering.

Having reviewed the Complaint in its entirety, the Court finds that the plaintiff has failed to allege two predicate acts sufficient to maintain his RICO claims against the defendants. As a result, the RICO claims must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Dismissing the RICO allegations however leaves the remaining state law claims.

### C. *State law claims*

In addition to the RICO claims discussed above, the plaintiff has brought several state law claims pursuant to New York Business Corporations Law and New York common law. The Court has jurisdiction over these causes of action under the doctrine of supplemental jurisdiction. Pursuant to 28 U.S.C. § 1367(a), where the federal court has supplemental jurisdiction over those claims that "are so related" to the claims within the court's original jurisdiction that they "form part of the same case or controversy under Article III of the United States Constitution." The Court however, may "decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it had original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also United ed Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (addressing the doctrine of "pendent jurisdiction," the predecessor to "supplemental jurisdiction"). This is especially so at the early stages of a litigation. *See Travelers Ins. Co. v. Keeling,* 996 F.2d 1485, 1490 (2d Cir.1993) (in a case where "all federal-law claims are eliminated before trial [the district court should] declin[e] to exercise jurisdiction over the remaining state law claims") (internal quotation omitted).

Having dismissed the plaintiff's RICO claims which serve as the Court's source of original jurisdiction in this case, the Court, in an exercise of its discretion, dismisses all the remaining state law claims. At this early stage in the litigation, the plaintiff will not be prejudiced if he brings his state law claims in the New York Supreme Court.

### D. *Leave to replead*

Finally, the plaintiff requests that if the defendants' motion is granted, that he be given leave to replead his claims. Fed. R.Civ.P. 15(a) provides that "leave [to amend a pleading] shall be freely given when justice so requires." *See also Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995); *Block v. First Blood Associates,* 988 F.2d 344, 350 (2d Cir.1993). Only "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ... [or] futility of the amendment" will serve to prevent an amendment prior to trial. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *accord Zahra,* 48 F.3d at 685; *Block,* 988 F.2d at 350 ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing of prejudice or bad faith.").

Applying these standards, the Court grants the plaintiff's motion for leave to replead. As stated above, the plaintiff has successfully pled a single predicate act for mail fraud which would support his RICO claims. He has also sufficiently alleged a fraudulent scheme. However, because he has failed to plead a second act of mail fraud, bribery or money laundering, the RICO claims had to be dismissed. Curing any of these defects would revive his claims. Accordingly, construing Rule 15 liberally, and in the interests of justice, the plaintiff's motion for leave to replead is granted.

### III. *Conclusion*

Having reviewed the parties' submissions, and hearing oral arguments, and for the reasons set forth above, it is hereby

ORDERED, that the defendants' motion to dismiss the Complaint pursuant to Fed. R.Civ.P. 12(b)(6) is granted; and it is further

ORDERED, that the plaintiff's motion for leave to replead pursuant to Fed.R.Civ.P. 15(a) is granted and the plaintiff may file and serve his amended complaint within twenty days from the date of this order.

SO ORDERED.