UNITED STATES of America,
Appellee–Cross–Appellant,

v.

Melvyn ALTMAN, Defendant–
Appellant–Cross–Appellee.

Nos. 253, 388, Dockets 94–1108, 94–1122.

United States Court of Appeals,
Second Circuit.

Argued Nov. 2, 1994.

Decided Feb. 16, 1995.

Gerald L. Shargel, New York City (Michael S. Pollok, of counsel), for defendant-appellant-cross-appellee.

Paul A. Engelmayer, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., S.D.N.Y., Christopher P. Reynolds, Paul Shechtman, Asst. U.S. Attys., of counsel), for appellee-cross-appellant.

Before: MINER, JACOBS and PARKER, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant Melvyn Altman appeals from a judgment of conviction and sentence entered on February 1, 1994 in the United States District Court for the Southern District of New York (Knapp, J.), following a jury trial, convicting him of four counts of mail fraud, in violation of 18 U.S.C. § 1341, one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3), five counts of making false statements on bank loan applications, in violation of 18 U.S.C. § 1014, and two counts of subscribing to false federal tax returns, in violation of 26 U.S.C. § 7206(1). Grouping the mail fraud convictions with the witness tampering and false bank application convictions for sentencing purposes, the district court sentenced Altman to a prison term of 41 months, to be followed by a supervised release term of three years. The court also ordered payment of restitution and a special assessment of $500. On the income tax counts, the court sentenced Altman to a concurrent prison term of 16 months as well as a concurrent supervised release term of one year, and ordered the payment of restitution and a $100 special assessment.

On appeal, Altman challenges his conviction on the mail fraud counts as based on insufficient evidence, contends that the Sentencing Guidelines were applied erroneously in regard to those counts, asserts that reversal of his mail fraud convictions inevitably

leads to reversal on the other counts, and argues that the district court should have departed downward on account of his medical condition and because his criminal conduct was aberrant. The government cross appeals for the purpose of challenging the district court's denial of sentence enhancements for obstruction of justice and violating a court order. For the reasons that follow, we reverse the convictions on the mail fraud counts, affirm the convictions on the remaining counts and remand for resentencing, with instructions.

## BACKGROUND

### I. Of "Brazil En Fete"

This is the story of a lawyer who fancied himself an impresario. Melvyn Altman, whose previous show business experience consisted of a limited practice in entertainment law, became deeply involved as financial backer, producer and counsel in a dancing and variety show that originated in Brazil. This production, known variously as "Rio By Nite," "Brazil En Fete" and "The Great Brazil Show," never made it to Broadway. After a brief run in Miami, the show opened on May 20, 1985 at the Palais des Sports in Paris. It played to sparse audiences there for a brief period and then closed for good, due to lack of funds, in early June, 1985. The show was a financial disaster, and Altman lost substantial sums of money that he had invested in the production—his own funds as well as funds that he had embezzled. The funds that were embezzled to prop up the faltering production were entrusted to Altman in a fiduciary capacity—as executor of the estate of his friend, David Haber, deceased, and as court-appointed conservator of the person and property of Armando Corsini, a mentally handicapped person.

### II. Of the Haber Estate

Altman was appointed executor of the Haber estate on December 9, 1983. The estate assets totaled approximately $1.2 million dollars, and Altman, as sole executor, was responsible for collecting the estate's assets, paying its expenses, making distributions to the beneficiaries and keeping proper records. At the time of his appointment, Altman had

been involved for more than a year in the production and promotion of the show, having already invested several hundred thousand dollars of his own money in the expectation of receiving 10–20% of the show's profits. By early 1984, Altman was aware that his investment was in jeopardy, because the company responsible for securing financing for the production, LRC Inc., was running short of cash. Altman was a director of LRC and, in October of 1984, Barry Kaplan, the president of the company, advised him in writing that an infusion of money was necessary to avoid a total loss.

Commencing in July of 1984, Altman embarked on a course of looting the Haber estate and transferring the funds into the bottomless pit that the show had become. He went about the removal of the funds by liquidating the estate's certificates of deposit and treasury bills, depositing the proceeds into the estate bank account and then drawing checks for the use of the show. In July and August of 1984, Altman converted $115,000 of estate funds. After hearing in January of 1985 from Marvin Krauss, the show's general manager, that the entire investment would be lost if additional funds were not forthcoming, Altman converted an additional $380,000 between February and April of 1985. Of the total amount embezzled from the estate, approximately $125,000 was passed through Altman's personal bank account and the balance was passed principally to the producer and director of the show and to the wire-transfer company that paid the show's expenses.

Edith Haber, widow of David Haber and principal beneficiary of the Haber estate, was represented by attorneys Arthur Brown and Dean Braslow. Between 1985 and 1989, the attorneys repeatedly called upon Altman to make distributions to their client, who was ill, elderly and in need of funds. Altman falsely represented to them that the estate money was tied up in certificates of deposit and treasury bills and that an IRS audit was pending. In 1986 and 1987, Altman disgorged four $50,000 payments to Edith Haber after her attorneys threatened to take action against him in the Surrogate's Court. Edith Haber died in January of 1988, and

her attorneys pressed Altman for further information and for distributions to her estate. Continuing to receive unsatisfactory answers to their inquiries, the attorneys in late 1988 petitioned the Surrogate's Court for an accounting. That court ordered Altman to account for his actions as executor.

After some delay, Altman submitted an accounting to Braslow on April 10, 1989. Braslow signed the receipt that Altman had prepared, acknowledging that he had received "Melvyn Altman's First Intermediate Accounting For The Estate of David Haber." Included in the accounting was a statement that the estate had made loans in the aggregate amount of $495,000 to a "theatrical production company in Europe," with interest accruing at 10% per annum. Also included was a representation that the balance of the principal remaining due on the loans, $93,500, together with interest in the total sum of $91,528.48, would be paid on August 1, 1989. There never were any "loans" as such and, even if there were, the production company could not repay them, having ceased to exist four years earlier. Altman had taken $37,000 in executor's commissions and secured Braslow's consent to credit himself with $20,000 more. It was not until November of 1990, however, that Altman raised the money to provide the Edith Haber estate with the final payment due from the David Haber estate.

The accounting was false in another respect, because it failed to reveal the repayment of a $50,000 loan that Altman had received on behalf of the David Haber estate from Richard Gamsu, a friend of David Haber. Gamsu had executed to Haber a promissory note, with a due date of January 28, 1984, as evidence of the debt. Altman received full payment on the note in January of 1984 and deposited it in his own account. He never returned the money to the estate and never listed it as an estate asset at any time. When reviewing the accounting with the attorneys who had pressed him to provide it, Altman represented that the debt had been repaid before Haber's death and was omitted from the accounting for that reason. In January of 1992, during the course of an FBI investigation, Gamsu stated that he owed no

money to the Haber estate but that Altman had borrowed $50,000 from him, an amount still unpaid. Later, Gamsu admitted that he owed Haber the $50,000 at the time of Haber's death, that he had never loaned the money to Altman and that he had lied because Altman, who was a close friend, asked him to do so.

### III. Of the Corsini Conservatorship

By order of the New York County Surrogate's Court dated January 9, 1985, Altman was appointed Conservator of the Person and Property of Armando Corsini. Armando's father, Andrea Corsini, had died on July 26, 1984 leaving an estate then valued at approximately $106,000. Armando was the sole distributee of the estate. He also was the beneficiary of nine Totten Trust bank accounts established by his father having a total value in excess of $246,000. Carlos Agosto, with whom Armando lived, filed a petition to be appointed conservator, but a guardian appointed by the court testified that Mr. Agosto did not have the necessary skills to discharge the duties required. Accordingly, the court appointed Altman as conservator for Armando Corsini and later appointed him administrator of the estate of Andrea Corsini.

Although a conservator is required by New York law to file a sworn accounting in January of each year describing the condition of his stewardship, Altman did not file his 1985 accounting until March 2, 1987. This filing came only in response to threats by a referee that a removal proceeding would be instituted if Altman failed to account. The referee was appointed by the court to review each annual accounting, and his recommendations were reported to a special referee, who acted in a supervisory capacity on behalf of the Appellate Division of the New York Supreme Court. In his accounting, Altman stated that he had made loans totaling $206,400 to E. Belle—M. Santos Productions, Inc. during the period May 3 to May 23, 1985. E. Belle—M. Santos was, of course, the production company for Brazil En Fete. According to the accounting, the money was to be repaid within 24–36 months of the last advance, with interest at 15% and a 10% share in any

net income generated by the production. Altman noted that he had guaranteed repayment by executing a promissory note.

After examining Altman's report, the referee submitted his own report to the special referee. In it, the referee was critical of the theatrical investment, noting that the conservator, without court approval, had placed the corpus of the conservatee's estate in a high-risk venture in which the conservator had a personal interest. The referee recommended that the conservator make application for leave to file an intermediate accounting within thirty days and further recommended that, when the accounting was filed, the court consider whether Altman should be removed as conservator and compelled to reimburse the estate for the monies loaned plus accrued interest. The referee noted that the $250,-000 bond posted by Altman appeared to be sufficient for the protection of the estate. The special referee thereafter issued an order on behalf of the court confirming and adopting the report of the referee in all respects and directing payment to the referee from the estate for his services and disbursements.

Except for the direction to pay the referee for his services and disbursements, Altman failed to comply with the order. The referee assumed that the case had been terminated and closed his file in June of 1989, at which time he solicited Altman's confirmation that there had been a judicial settlement of his accounts. Altman did not respond to the inquiry or take any further steps in regard to the repayment of the alleged loans. He also made no claims on the $250,000 bond, which by then was insufficient to cover the money stolen from the estate. The embezzlement was not discovered until 1991, when the FBI conducted a search of Altman's office. It was not until 1992 that Altman was removed as conservator by the Surrogate's Court. At that time, there was $12,596.00 remaining in the Corsini account, and Altman requested a $15,000 fee for his services. When Altman filed his 1985 account in 1987, the production was defunct, there was no way in which any investments in the show could be recovered or any profits realized, and the embezzlement already was a fait accompli.

## IV. Of the Contentions on Appeal

Altman was convicted of one count of mail fraud upon the Haber estate. The nature of the mailing described in that count was a letter bearing the signature of Attorney Braslow, acknowledging receipt of Altman's Haber Estate accounting of April 10, 1989, which was mailed from Braslow to Altman at the latter's request. Altman also was convicted of three counts of mail fraud upon Armando Corsini, with the nature of the mailings as follows: letter dated August 12, 1987 to Altman from the referee enclosing an order signed by the special referee; letter dated August 20, 1987 to Altman from the referee enclosing a copy of the report of the referee to the special referee in accordance with Altman's request; and a bank account statement for May, 1989 in the name of Altman as conservator, mailed by Manufacturers Hanover Trust Company to Altman in June of 1989. Altman contends on appeal that the evidence was insufficient to sustain mail fraud convictions in either the Haber matter or the Corsini matter.

With respect to Altman's remaining counts of conviction, the counts charging false statements on bank loan applications stemmed from his failure to list the debts to the Corsini and Haber estates in the applications. The tax counts charged that Altman's personal returns for 1987 and 1989 were false in that they omitted income received from a certain receivership unrelated to the Corsini and Haber estates. The convictions on the witness tampering count related to Haber's instructions to Richard Gamsu to give false information regarding Gamsu's $50,000 payment to the estate. Altman's contention with regard to these remaining counts boils down to a claim that there would be no conviction on these counts if they were prosecuted separately from the mail fraud charges. He states that "if the mail fraud counts were removed from this case, the trial of the remaining allegations would have been put in an entirely different light, a light which would have allowed a fair resolution of these charges."

Attacking the sentence, Altman contends that the district court erroneously calculated

his sentence for mail fraud by applying the 1991 version of the Sentencing Guidelines and, because the money was not fraudulently obtained, by counting the loss to include the $495,000 from the Haber estate that went into the show. Also, Altman argues that he is entitled to resentencing because the district court did not understand its authority to depart downward and because his health was poor and because his conduct was aberrant.

In its cross appeal, the government challenges the district court's refusal to apply the obstruction of justice enhancement, contending that the conduct giving rise to Altman's convictions for witness tampering warranted application of that guideline. The government also challenges the district court's refusal to enhance the sentence for violation of the judicial order requiring the filing of an intermediate accounting. The government contends that the authorities would have learned about the missing funds if the order were complied with and argues that "it is difficult to conceive of a court order whose violation would be more central to a fraud scheme."

## DISCUSSION

### I. Of the Elements of Mail Fraud

■ Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing ...

is guilty of mail fraud. 18 U.S.C. § 1341. Accordingly, the elements necessary to establish the offense are: 1) a scheme or artifice to defraud 2) for the purpose of obtaining money or property (or of depriving another of the intangible right of honest services, *see* 18 U.S.C. § 1346) and 3) use of the mails in furtherance of the scheme. *See United States v. Wallach,* 935 F.2d 445, 461 (2d

Cir.1991). Proof of fraudulent intent is required. *Id.*

### II. Of the Scheme to Defraud

The Supreme Court early on gave the scheme to defraud element a broad interpretation, construing it to "include[ ] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *Durland v. United States,* 161 U.S. 306, 313, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896). In the *Durland* case, the Court specifically rejected the contention that "the statute reaches only such cases as, at common law, would come within the definition of 'false pretenses,' in order to make out which there must be a misrepresentation as to some existing fact and not a mere promise as to the future." *Id.* at 312, 314, 16 S.Ct. at 510, 511. Despite its expansive reading of the scheme to defraud element, the Court drew the line in a case where the mails were used to obtain money by threats of murder or bodily harm. *See Fasulo v. United States,* 272 U.S. 620, 47 S.Ct. 200, 71 L.Ed. 443 (1926). Although the words "scheme or artifice to defraud" were considered to include a "great variety of transactions," the Court held that "they do not include threat and coercion through fear or force." *Id.* at 628, 47 S.Ct. at 202.

■ By embezzling the estate funds with which he was entrusted as a fiduciary, Altman effectuated a scheme to defraud within the meaning of the mail fraud statute:

> The concept of "fraud" includes the act of embezzlement, which is " 'the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another.' " *Grin v. Shine,* 187 U.S. 181, 189 [23 S.Ct. 98, 101, 47 L.Ed. 130] (1902).

*Carpenter v. United States,* 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987). Clearly, Altman appropriated funds for his own use from time to time from the estates that were entrusted to his care and that he was charged with administering. He used the funds to bolster a show in which he had a substantial personal interest. It is a general rule that the intentional conversion of funds held in a fiduciary capacity to the personal use of the fiduciary is a fraud upon those for

whom the funds are held. *See United States v. Buckner*, 108 F.2d 921, 926 (2d Cir.), *cert. denied*, 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016 (1940). Altman is guilty of that fraud.

■ Altman is guilty of fraud in another respect. The Supreme Court over seventy years ago determined that the words "to defraud" commonly "signify the deprivation of something of value by trick, deceit, chicane, or overreaching." *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). Overreaching on the part of a fiduciary includes concealment under certain circumstances:

> [T]he concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to the other is a violation of the [mail fraud] statute.

*United States v. Bronston*, 658 F.2d 920, 926 (2d Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).

Aside from the frequent misrepresentations by Altman to Edith Haber's attorneys regarding the condition of the David Haber estate, the estate accounting filed on April 10, 1989 by Altman as Executor failed to disclose several items of material information: that the loans supposedly made to a "theatrical production company in Europe" were not evidenced by any writing; that there was no possibility that the balance of principal or interest on the loans could be paid because the production company had been non-existent for four years; and that the $50,000 loaned by David Haber to Richard Gamsu had been repaid to the estate. It cannot be gainsaid that the failure to disclose resulted in harm to Edith Haber, the principal beneficiary of the estate, who was ill, elderly and in need of funds for living expenses. Had she or her estate representatives been aware of the true facts, appropriate action against Altman could have been taken.

■ Altman's accounting in the Corsini conservatorship likewise failed to disclose material information. The accounting was filed in 1987 and was the annual accounting for 1985. It came about only after threats were made by the referee to remove Altman as conservator. The accounting listed $206,400 in loans made to the production company between May 3 and May 23, 1985, when the company was in its last throes in Paris. By the time the accounting was filed in 1987, however, the production company had expired and there was no way in which the loan could be repaid. Altman failed to disclose this fact in the accounting, never filed another accounting of his stewardship, as required, and never repaid the stolen funds. The harm to Altman's ward, Armando Corsini, who was living with a friend in reduced circumstances, is readily apparent. Had there been a proper disclosure, appropriate action could have been taken to recover the stolen funds from Altman, who had substantial assets at the time. Also, recovery might have been sought upon the bond posted by Altman for the protection of the conservatee.

The evidence is overwhelming that Altman's "object was to filch from [the estates their] valuable property by dishonest, devious, reprehensible means. That is to 'defraud', for 'the law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity.'" *Abbott v. United States*, 239 F.2d 310, 314 (5th Cir.1956) (quoting *Weiss v. United States*, 122 F.2d 675, 681 (5th Cir.), *cert. denied*, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941)).

### III. Of the Mailing Element

■ With respect to the mailing element, the Supreme Court has written:

> The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.

*Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). The scheme to defraud need not contemplate the use of the mails as an essential part of the scheme as long as the mailing is *"incident* to an essential part of the scheme." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954) (emphasis supplied). The government must establish that the defendant caused the mailing, i.e., "act[ed] with

knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Id.* at 8–9, 74 S.Ct. at 363.

■ A mailing cannot be said to be in furtherance of a scheme to defraud when it occurs after the scheme has reached fruition. *See Kann,* 323 U.S. at 94, 65 S.Ct. at 150. Obviously, such a mailing cannot be considered even as incident to an essential part of the scheme. In the *Kann* case, the defendants cashed fraudulently obtained checks at various banks, knowing that the checks would be forwarded to a drawee bank for collection. The court held that the mailing was not material to the consummation of the scheme, and therefore concluded that there was no mail fraud. *Id.* To the same effect was *United States v. Maze,* 414 U.S. 395, 401–02, 94 S.Ct. 645, 649–50, 38 L.Ed.2d 603 (1974), in which the Court determined that the mailing element was not satisfied by the mailing of credit card invoices for payment following the use of a stolen credit card to obtain goods and services. *See also Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) (mailing element not satisfied either by mailing of credit card statements by oil company to school district defrauded by unauthorized use of card or by mailing of checks in payment of the statements). It is clear that proximity to a mailbox sometime before or after the execution of a scheme to defraud simply does not fill the bill.

The "mailing in furtherance" requirement found its farthest reach in *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). The defendant in that case was a used-car distributor who purchased used cars, rolled back their odometers and sold the vehicles to retail dealers at prices he was able to inflate by reason of the low-mileage readings. The dealers, unaware of the fraud, resold the automobiles to their customers, who also paid inflated prices. The Court, in a 5–4 decision, held that the mailing element was satisfied by the dealers' mailings of title application forms to the state of Wisconsin on behalf of the customers:

[A] rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme, a scheme which did not reach fruition until the retail dealers resold the cars and effected transfers of title.

*Id.* at 712, 109 S.Ct. at 1448. Finding that the scheme would have come to an end if the dealers had lost faith in the distributor or were unable to re-sell the cars, the Court concluded:

Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.

*Id.*

■ None of the mailings relied upon by the government in the prosecution of Altman was incident to any essential part of his scheme to defraud the estates. None of the mailings was necessary to avoid jeopardizing a "relationship of trust and good will" as was the case in *Schmuck. Id.* at 714, 109 S.Ct. at 1450. None was a "part of the business of processing a claim or transaction" as was the case in *United States v. Bortnovsky,* 879 F.2d 30, 40 (2d Cir.1989). The mailings were insufficiently related to Altman's scheme to be said to be in furtherance of it. *See United States v. Dick,* 744 F.2d 546, 552 (7th Cir. 1984); *United States v. Tackett,* 646 F.2d 1240, 1244 (8th Cir.1981). By the time Attorney Braslow mailed to Altman an acknowledgment of the receipt of Altman's Haber Estate accounting of April 10, 1989, the looting of the estate was long past and the fraudulent accounting was completed. The mere mailing of an acknowledgment that the accounting was received could no longer further the scheme.

In the Corsini Estate situation, the three mailings relied upon by the government likewise were too remote from the scheme and were insufficiently related to it to support mail fraud convictions. The mailing of the letter dated August 12, 1987, forwarding an order signed by the special referee, did nothing to advance the scheme. That order only confirmed the report of the referee that was critical of Altman's stewardship and effectu-

ated the referee's recommendation that Altman file an additional accounting. The looting had already taken place and the fraudulent annual accounting had already been filed. The mailing of the letter on August 20, 1987 enclosing the referee's report certainly did nothing to advance the scheme. Finally, the mailing of the bank statement from Hanover Trust Company in June of 1989 cannot by any stretch of the imagination be considered to further the scheme to defraud the Corsini Estate. That statement merely reflected the barren condition of the bank account. The mail fraud charges must be dismissed.

## IV. Of the Remaining Counts

Altman contends that the reversal of his convictions on the mail fraud counts should result in a reversal of his convictions on the remaining counts. Altman does not make it clear why this should be so. He says only that "the remaining counts are charges which most probably would never have been prosecuted alone and, if prosecuted alone, would most probably not have resulted in conviction." We reject the contention, in the absence of any showing of "compelling prejudice." See United States v. Novod, 927 F.2d 726, 728 (2d Cir.), cert. denied, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991); see also United States v. Warner, 690 F.2d 545, 554 (6th Cir.1982). The trial judge instructed the jury to consider each count separately, and the convictions on the remaining counts were independently supported by overwhelming evidence, which included evidence relevant to the mail fraud counts. Gamsu's testimony was sufficient to convict Altman for witness tampering; documentary evidence supported the convictions for false bank loan statements, Altman having failed to list his indebtedness to the Haber and Corsini Estates on those statements; and the tax count convictions were fully supported by documentary and other evidence that Altman failed to include as income on his 1987 and 1989 personal tax returns certain income he received in connection with a receivership. There is no basis for reversal of Altman's convictions on the remaining counts.

## V. Of Sentence

Because we remand with instructions to vacate the mail fraud convictions, Altman must be re-sentenced. His challenges to his sentence on the mail fraud counts—that the district court erroneously calculated his sentence for mail fraud by applying the 1991 version of the Sentencing Guidelines and by erroneously calculating the loss in the Haber Estate—are moot. Likewise moot is the government's challenge on cross-appeal to the district court's refusal to enhance the sentence for violation of the order requiring an intermediate accounting. The government's claim on cross-appeal that the district court erred in refusing to apply the obstruction of justice enhancement also must be rejected. With the elimination of the mail fraud convictions, the obstruction of justice enhancement now applies only to the witness-tampering count. Under the circumstances, the two-level enhancement the government seeks for obstruction is prohibited. See U.S.S.G. § 3C1.1, comment. (n. 6).

The parties dispute whether Altman's claim for a downward departure in his sentence for health reasons was waived in the district court, but the claim fails in any event. Section 5H1.4 of the Sentencing Guidelines restricts departures based on physical condition to defendants with an "extraordinary physical impairment," such as those which render a defendant "seriously infirm." The defendant here claims that the district court did not recognize its power to depart, but the record does not support that claim. The health problems cited by the defendant simply need monitoring, and Altman does not challenge the district court's finding that the Bureau of Prisons would be fully able to monitor his health. We can conclude that the district court did not consider Altman to have an extraordinary physical impairment. The district court will be free, however, to consider the current state of Altman's health on re-sentencing.

We reject Altman's claim that the district court did not understand its authority to depart downward on the ground that Altman's crimes constituted a "single aberrant act." Section 3553(a)(1) of Title 18 directs sentencing courts to consider "the nature and

circumstances of the offense and the history and characteristics of the defendant," and some courts have construed this to include aberrational acts. *See, e.g., United States v. McCarthy,* 840 F.Supp. 1404, 1407 (D.Colo. 1993). While this court has not yet confronted the issue of "single aberrant act," the repeated and long-lasting criminal conduct involved here cannot under any circumstances be considered a "single aberrant act."

## CONCLUSION

We reverse the convictions on the mail fraud counts and affirm the convictions on the remaining counts. We vacate the sentence and remand to the district court for resentencing in accordance with the foregoing.