UNITED STATES of America, Appellee,

v.

Frank SLEVIN, Defendant–Appellant,

William Leslie, Defendant.

No. 82, Docket 95–1713.

United States Court of Appeals,
Second Circuit.

Argued Aug. 29, 1996.

Decided Dec. 18, 1996.

Harry R. Pollak, New York City, for Defendant–Appellant.

Susan E. Brune, Assistant United States Attorney for the Southern District of New York, New York City, (Mary Jo White, United States Attorney, Marian W. Payson, Assistant United States Attorney, New York City, of counsel), for Appellee.

Before: MESKILL, KEARSE, and MAHONEY *, Circuit Judges.

---

* The Honorable J. Daniel Mahoney, who was a member of the panel, died on October 23, 1996. Prior to his death, he participated in the consideration and decision of this case.

MAHONEY, Circuit Judge **:

Defendant-appellant Frank Slevin appeals from a judgment of conviction entered on December 27, 1995 in the United States District Court for the Southern District of New York. A jury found Slevin guilty on one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371, five counts of mail fraud in violation of 18 U.S.C. § 1341, and one count of wire fraud in violation of 18 U.S.C. § 1343. Slevin raises several challenges to his convictions and sentencing. First, he challenges the sufficiency of the evidence that he was engaged in a "scheme ... to defraud" in violation of the mail and wire fraud statutes. *See* 18 U.S.C. §§ 1341, 1343. Next, he argues that the use of the mails in this case was not "in furtherance" of his fraudulent scheme. *See id.* Finally, he contends that the sentencing court erred in refusing to hold a full evidentiary hearing regarding the amount of economic loss borne by his victims. Finding no merit in his contentions, we affirm.

### Background

Between 1988 and 1994, Slevin established several offshore corporations that provided construction contractors with payment and performance bonds. Such bonds insure contract obligees against contractor defaults. The federal government keeps a list of bonding companies (the "Treasury list") that are licensed, well-capitalized, and have established a record of reliable performance on their obligations. Bonds from such companies are typically required by contract obligees, sometimes even as a prerequisite to bidding on construction contracts.

Slevin's enterprise provided payment and performance bonds, directly or through brokers, to companies that were unable to acquire bonds from Treasury-listed companies. In this venture, using an umbrella corporation called Manufacturers, Retailers and Contractors Association, Limited, which he portrayed as a Virgin Islands company, Slevin provided fraudulently-obtained signatures

---

** Judge Mahoney was the principal author of the opinion of the Court.

and false documents; he employed a network of mail drops and a telephone answering service in St. Thomas, U.S. Virgin Islands. Slevin's actual "office" was in a garage behind a house in Brooklyn, New York. Slevin's bonds, which bore issuer names that were deceptively close to the names of actual Treasury-listed companies, were then used by the contractors to secure construction contracts. Contractors paid Slevin's umbrella corporation $500 to be part of an association which enabled them to purchase bonds issued by Slevin's other companies. Contractors also paid premiums for the bonds, typically two-to-three percent of the contract price. The contractors were then typically reimbursed by the contract obligees for the bond premiums.

Slevin's shell companies were seriously undercapitalized, and he apparently never planned to pay claims in the event of a contractor default. To preserve his enterprise, however, Slevin went to great lengths to discourage contractors from defaulting and to retain the confidence of contract obligees. For example, in at least one case, he contacted the obligee directly; in another, he created a fraudulent auditing statement to assuage obligee concerns. Nevertheless, when contract obligees seemed to be incurably suspicious,*** or when a contractor defaulted, as occurred on at least one occasion, Slevin would simply disappear, later to re-emerge under a different bonding company name, and the cycle began anew.

Slevin intentionally avoided providing bonds for federal contracts so as to avoid potential federal racketeering charges, and he avoided using the mails, attempting to avoid exposure to mail fraud charges. The mail fraud charges on which Slevin was convicted were based on the mailing of checks by contract obligees to contractors as reimbursement for the costs of the bond premiums the latter had paid to Slevin's companies.

Slevin was convicted by a jury on June 13, 1995. On December 13, 1995, the Honorable Peter K. Leisure, United States District Judge, sentenced Slevin principally to a 78-month term of imprisonment, which he is currently serving, and ordered him to pay restitution. In calculating Slevin's sentence, Judge Leisure accepted, without a full evidentiary hearing, an estimate from the Probation Department that the economic harm to Slevin's victims totaled $6,952,874.50. Before accepting this estimate, Judge Leisure reviewed trial testimony regarding damages, received written submissions, and heard oral argument. This appeal followed.

## Discussion

### A. The Sufficiency of the Evidence of a Scheme To Defraud

The federal fraud statutes prohibit the use of the mails or wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1341, 1343. Because these statutes use the same relevant language, they are analyzed in the same way. See, e.g., United States v. Schwartz, 924 F.2d 410, 416 (2d Cir.1991); United States v. Covino, 837 F.2d 65, 71 (2d Cir.1988).

Slevin first challenges the sufficiency of the evidence to support his convictions of mail and wire fraud, arguing that the government showed only that his bonding companies were undercapitalized, not that he was engaged in a scheme to defraud. In order to prevail on such a challenge, Slevin must show that the evidence was not adequate " 'to convince any rational trier of fact beyond a reasonable doubt' " that he was engaged in such a scheme. United States v. Valenti, 60 F.3d 941, 945 (2d Cir.1995) (quoting United States v. Sureff, 15 F.3d 225, 228 (2d Cir. 1994)) (emphasis ours). Viewing the evidence in the light most favorable to the government and drawing all permissible inferences in the government's favor, as we must, see id., we regard Slevin's challenges to the sufficiency of the evidence as meritless.

Contrary to Slevin's argument, the government presented evidence not merely that Slevin was operating undercapitalized bonding companies but evidence that he had de-

***Some obligees, after investigating, refused bonds issued by Slevin's companies.

vised and was engaged in an imaginative scheme to deceive and defraud. He used company names that were deceptively similar to those of legitimate entities in an attempt to pass off his bonds as those of Treasury-listed issuers. He used an elaborate network of addresses that were no more than mail drops, ring-through telephone lines, and telephone answering services to give his shell companies the appearance of legitimacy. He falsified some signatures and documents; he procured others under false pretenses. He prepared or caused to be prepared false financial statements to deceive contract obligees about the solvency of his companies. For example, one false audit by an apparently fictitious accountant was prepared to address an obligee's concerns. Slevin also attempted to purchase a second auditing statement from an actual accountant who, Slevin was told, would prepare audited financial statements without reviewing any documentation or otherwise verifying the information in the statements.

There was also ample evidence that all of this was done with intent to deceive and defraud, and to enrich Slevin. When a contractor defaulted, Slevin simply caused the bond-issuing company to disappear. A cooperating coconspirator testified at trial as to details Slevin had confided in him with respect to how the scheme worked, Slevin's intent to defraud, and what they must do to avoid racketeering and mail fraud charges.

This evidence sufficed to meet the scheme-to-defraud element as it has been interpreted by this Court. *See, e.g., United States v. Wallach*, 935 F.2d 445, 461 (2d Cir.1991) (holding that government need prove only fraudulent intent and that defendant "contemplated some actual harm or injury"), *cert. denied*, 508 U.S. 939, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993); *see also United States v. Altman*, 48 F.3d 96, 101 (2d Cir.1995) ("The Supreme Court early on gave the scheme to defraud element a broad interpretation, construing it to 'include[ ] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future.'" (quoting *Durland v. United States*, 161 U.S. 306, 313, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896))). Here, there was

strong evidence of intent, deception, and not only contemplated harm, as required by *Wallach*, but realized harm. We accordingly reject Slevin's first sufficiency challenge.

**B. The "In Furtherance" Requirement**

 Slevin next contends that the government failed to establish that there were any mailings "in furtherance" of his fraudulent scheme. He points out that the proven mailings, of checks by contract obligees sent as reimbursement to contractors for the bond premiums that contractors had paid to Slevin's shell companies, occurred after Slevin had received payment for the bonds from the contractors. He argues, relying on *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), and *United States v. Altman*, 48 F.3d 96, that since the mailings occurred after he had received payments, the mailings could not have been in furtherance of the fraud. We disagree.

 In order to convict Slevin of mail fraud, the government was required to show "1) a scheme or artifice to defraud 2) for the purpose of obtaining money or property ... and 3) use of the mails in furtherance of the scheme." *Altman*, 48 F.3d at 101. The mailings do not need to be done . by the defendant personally; rather, the government need show only "(1) that the defendant[ ] 'caused' the mailing, namely that [he] must have acted 'with knowledge that the use of the mails w[ould] follow in the ordinary course of business, or where such use c[ould] reasonably be foreseen, even though not actually intended,' ... and (2) that the mailing was ... 'incidental to an essential part of the scheme.'" *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir.1989) (quoting *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954)).

 There is no requirement that the mailings precede the fraud. *See, e.g., Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); · *United States v. Sampson*, 371 U.S. 75, 79–80, 83 S.Ct. 173, 175–76, 9 L.Ed.2d 136 (1962). Where the frauds are not isolated or unrelated swindles, postfraud mailing of invoices,

checks, or receipts may further the scheme by, for example, lulling the victims into believing they received the services fraudulently promised, *see, e.g., United States v. Paccione,* 949 F.2d 1183, 1196 (2d Cir.1991), *cert. denied,* 505 U.S. 1220, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992); *United States v. Angelilli,* 660 F.2d 23, 36–37 (2d Cir.1981), *cert. denied,* 455 U.S. 910, 945, 102 S.Ct. 1258, 1442, 71 L.Ed.2d 449, 657 (1982), or by helping to keep the scheme in operation by preserving a needed business relationship between a fraud victim and the defendant, *see Schmuck v. United States,* 489 U.S. at 711–12, 109 S.Ct. at 1448–49.

In *Schmuck,* the defendant was a used car wholesaler who fraudulently rolled back odometers on cars that he sold to retailers. When the retailers resold the cars, they mailed title application forms for the vehicles to the state. These mailings, although occurring long after the wholesaler had been paid for the tampered-with vehicles, served as the predicates for his mail fraud conviction. The Supreme Court affirmed the conviction, rejecting the contention that the eventual title application mailings were not in furtherance of his scheme to defraud. The Court began by noting that Schmuck's fraudulent venture "was a not a 'one-shot' operation in which he sold a single car to an isolated dealer." *Id.* at 711, 109 S.Ct. at 1448. His was an "ongoing," "large-scale operation," in which he dealt with some retailers on a consistent basis for some 15 years. *Id.* The Court reasoned that

> [a] rational jury could have concluded that the success of Schmuck's venture depended upon his continued harmonious relations with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their ... customers.
>
> .... Schmuck's scheme would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had not been able to resell the cars obtained from him. These resales and Schmuck's relationships with the retail dealers naturally depended upon the successful passage of title among the various parties. Thus, although the registration-form mailings may not have

contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme.

*Id.* at 711–12, 109 S.Ct. at 1448. In sum, while Schmuck had already profited from the sale of the altered vehicles, the resale transactions that prompted the mailings—which were essential to the retailers' conduct of their own business—were also essential to Schmuck's scheme, since it was important to his long-term success to retain the custom and confidence of the retailers. In this sense, the Supreme Court concluded, the mailings could be found essential to and in furtherance of Schmuck's scheme to defraud.

Both *Kann* and *Maze,* relied on here by Slevin, were distinguished by the Supreme Court in *Schmuck* on the basis that the defendants in those cases had no interest in whether their fraud victims transmitted any information to third parties or escaped losses as a result of the frauds, *see* 489 U.S. at 713–15, 109 S.Ct. at 1449–50. In *Kann,* the defendants had fraudulently obtained two checks and cashed them. The *Kann* Court held that the cashing bank's mailing of the checks to the drawee bank was not in furtherance of the fraud because the defendants had no interest in whether the former collected from the latter: " 'It was immaterial to them....' " *Schmuck,* 489 U.S. at 713, 109 S.Ct. at 1449 (quoting *Kann,* 323 U.S. at 94, 65 S.Ct. at 151). In *Maze,* which involved the defendant's theft and fraudulent use of his roommate's credit card, the Court held that mailings of merchant invoices and bills to the card owner were not in furtherance of the fraud because there was "no indication that the success of [the] scheme depended in any way on which of his victims ultimately bore the loss. Indeed, from his point of view, he probably would have preferred to have the invoices ... never mailed at all," 414 U.S. at 402, 94 S.Ct. at 649 (footnote omitted), for the mailings "increased the probability that respondent would be detected and apprehended," *id.* at 404, 94 S.Ct. at 650. *See also Wallach,* 935 F.2d at 465 (noting that in *Maze,* "the alleged perpetrators had no intention of continuing to communicate with the victims of their fraud").

*Kann* and *Maze* are similarly distinguishable from the present case. Here, as in *Schmuck*, the fraudulent venture was not an isolated swindle but rather was an ongoing operation in which Slevin sought to provide contractors, who could not obtain bonds from Treasury-listed companies, with bonds for all of their construction jobs. For example, Slevin informed one insurance broker, who provided a principal outlet for Slevin's bonds, that a contractor could obtain assurance of a continuing source of bonding from Slevin by paying him an up-front fee of $500 and providing him with financial statements and a list of the contracts for which the contractor required bonding. As Slevin envisioned his scheme, therefore, it was in his interest that any contractor who paid him a premium be reimbursed by the obligee for that premium; otherwise, the contractor would not continue to obtain its bonding from Slevin.****

Slevin's reliance on this Court's decision in *Altman*, 48 F.3d 96, is also misplaced. That case involved an attorney who embezzled funds he held as a fiduciary. The mailings—of a referee's report, bank statements, and other documentation of the frauds themselves—were made by third parties long after the defendant had depleted those funds. We held that the mailings were not in furtherance of the fraud because the frauds were complete, not continuing, and the mailings were not necessary to "avoid jeopardizing a 'relationship of trust and good will' as was the case in *Schmuck*." *Id.* at 103–04. The circumstances in *Altman* were thus significantly different from those in the present case, in which the mailings of the premium reimbursement checks from the obligees to the contractors were important to the preservation of Slevin's relationship with the contractors and hence were necessary to the continuation of Slevin's fraudulent scheme.

We conclude that the jury was entitled to find that the mailings were in furtherance of Slevin's fraudulent scheme.

****The importance to Slevin of the reimbursement mailings is further evinced by the lengths to which he went to get obligees to accept his bonds and reimburse bond premiums long after contractors had remitted premiums to him. He prepared or had prepared fraudulent auditing reports for his companies which were then used

## C. *Denial of Evidentiary Hearing at Sentencing*

■■■. Slevin's final argument is that Judge Leisure erred by not holding a full evidentiary hearing on the amount of damages suffered by Slevin's victims. We reject this contention. The district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes. *See, e.g., United States v. Olvera*, 954 F.2d 788, 792 (2d Cir.), *cert. denied*, 505 U.S. 1211, 112 S.Ct. 3011, 120 L.Ed.2d 885 (1992); *United States v. Prescott*, 920 F.2d 139, 143–44 (2d Cir.1990). All that is required is that the court "afford the defendant some opportunity to rebut the Government's allegations." *United States v. Eisen*, 974 F.2d 246, 269 (2d Cir.1992), *cert. denied*, 507 U.S. 998, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993); *cf. United States v. Fatico*, 579 F.2d 707, 713 (2d Cir.1978) (noting that precedents require only that reliability of evidence be "ensured through cross-examination or otherwise"). Decisions as to what types of procedure are needed lie within the discretion of the sentencing court and are reviewed for abuse of discretion. *See, e.g., Prescott*, 920 F.2d at 144.

The record here reflects that the district court did not abuse its discretion. Slevin had been allowed to cross-examine damages witnesses fully at trial. At the sentencing stage, he was allowed to submit written argument to the court on the amount of loss and to argue the issue orally. Given these indicia of reliability, the use of estimates and hearsay by the government did not require a full-blown evidentiary hearing. *See* U.S.S.G. § 2F1.1, Application Note 8 (losses need not be determined with precision); U.S.S.G. § 6A1.3(a) (reliable evidence on disputed factors can be considered "without regard to its admissibility under the rules of evidence applicable at trial"). Nothing offered by Slevin

to persuade suspicious obligees of the company's legitimacy. In one instance, Slevin personally contacted a concerned obligee to assure it that delays in providing premium invoices were the result of the insurance company's move to a new location.

suggests that the district court erred in accepting the damages estimates with which it was presented or that it abused its discretion in declining to hold an evidentiary hearing on the damages issue.

## Conclusion

We have considered all of Slevin's contentions on this appeal and have found them to be without merit. The judgment of conviction is affirmed.