**UNITED STATES of America,**

v.

**Lucila JIMENEZ, Defendant.**

**No. 01 Cr. 563(GEL).**

United States District Court,
S.D. New York.

Feb. 20, 2002.

As Amended Feb. 21, 2002.

As Amended April 18, 2002.

Robin A. Linsenmayer, Assistant United States Attorney, New York City (James B. Comey, United States Attorney for the Southern District of New York, of counsel), for United States of America.

Jennifer Brown, New York City, for Lucila Jimenez.

*SENTENCING OPINION*

LYNCH, District Judge.

This case presents a question as to the circumstances under which a District Court is authorized to depart from the sentencing range presumptively applicable under the Sentencing Guidelines on

grounds of an extraordinary physical impairment.

Lucila Jimenez stands before the Court for sentencing, following her plea of guilty to one count of illegally reentering the United States after deportation in violation of 8 U.S.C. § 1326(a) and (b)(2). It is undisputed that under the United States Sentencing Guidelines, her adjusted offense level is 21 and her criminal history category is IV, yielding a sentencing range of 57 to 71 months' imprisonment.

That somewhat severe sentence for illegal reentry is the product primarily of two factors First, the offense level is substantially increased under U.S.S.G. § 2L1.2(b)(1)(A)(ii) because the original deportation followed conviction for a "crime of violence." The crime in question was burglary, which is defined as a crime of violence for these purposes by Application Note 1(B)(ii)(II) to that section. Second, Jimenez has an extensive criminal record, including a prior conviction for illegal reentry and a number of narcotics offenses.

Under these circumstances, the harsh sentence provided by the Guidelines would ordinarily be completely warranted. I am sympathetic to Jimenez's desire to make a better life for herself and her children in this country. But that desire does not justify illegal immigration to the United States, let alone criminal reentry following an initial deportation. Moreover, while in the United States, Jimenez has not conducted herself as an undocumented but productive member of society. Instead, she has repeatedly chosen to violate the law, and has apparently supported herself and her family largely through criminal acts. She served nearly three years in prison for convictions, arising from separate incidents, of criminal possession of a half kilogram of cocaine and burglary of a dwelling, before being deported to the Dominican Republic in 1993. Within a year,

while apparently still on parole from these convictions, she was apprehended in Puerto Rico, sentenced to prison for illegal reentry, and eventually deported. In 2000, having yet again returned to the United States illegally, she pled guilty to another narcotics charge in New York State court, and failed to appear for sentencing. Repeated prison sentences have failed to deter her from violating United States law, and a substantial term of imprisonment is unquestionably appropriate.

■ Jimenez has argued for a departure on two grounds, neither of which is persuasive to me. First, this is not a case for departure for diminished capacity. That departure only applies where the defendant "committed the offense while suffering from a significantly reduced mental capacity." U.S.S.G. § 5K2.13. While this language alone specifies only a temporal connection between the reduced mental capacity and the commission of the crime, logic suggests that mere temporal coincidence is insufficient, and that some degree of causal link between the diminished capacity and the criminal act is required. The full text of § 5K2.13 supports this conclusion, as the Guideline provides that where a departure is warranted under this section, "the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense"—suggesting that where there was no such contribution, no departure is warranted. Accordingly, courts have repeatedly held that a departure on this ground requires two elements: "reduced mental capacity and a causal link between that reduced capacity and the commission of the charged offense." *United States v. Prescott*, 920 F.2d 139, 146 (2d Cir.1990); *see also United States v. Piervinanzi*, 23 F.3d 670, 684 (2d Cir.1994); *United States v. Leandre*, 132 F.3d 796, 803–05 (D.C.Cir.1998); *United States v.*

*Cantu*, 12 F.3d 1506, 1515 (9th Cir.1993); *United States v. Lauzon*, 938 F.2d 326, 330–31 (1st Cir.1991). In this case, Jimenez cannot even establish synchronicity, as her mental impairment, described at greater length below, resulted from events in 2001, long after she had returned to the United States after her most recent deportation.

■ Second, this is not a case for departure for extraordinary family circumstances under U.S.S.G. § 5H1.6. I recognize that extraordinary family responsibilities can be a ground for departure, if only in "exceptional circumstances," *United States v. Faria*, 161 F.3d 761, 762 (2d Cir.1998). What family circumstances qualify as extraordinary is necessarily a highly fact-specific, and somewhat subjective, matter. Jimenez is not merely ("merely"!) a single mother with three children who will suffer grievously from her absence. One of her children suffers from significant disabilities, and the family members who are able to take over their care are themselves so poor that they have been unable to maintain a household in the United States for their own children. Defendant's case is thus more extreme than most, and might justify a departure. But if that were the only ground for departure, I would decline to depart, because the sentence is otherwise justified, and because defendant's repeated criminal acts and involvement with narcotics sets a terrible example for her children and raises questions about her suitability as a parent that offset some of the advantages to them of her presence.

■ However, this case is truly extraordinary, and requires a departure, on a different ground. Since this crime was committed, and since defendant's other offenses, she has suffered a grievous physical injury in the form of a brain aneurism,

that leaves her literally a different person than the one who committed those past offenses. She is mentally and physically weaker, and constitutes significantly less of a threat of law violation, than was the case previously. The undisputed medical evidence is that as a result of a bleeding artery in her brain, which required emergency neurosurgery to correct, Jimenez suffers from severe memory loss (to the point of occasional difficulty remembering her name), loss of strength in her right arm, headaches and blurred vision. In addition, apart from purely physical symptoms, Jimenez suffers from psychotic disorders including hallucinations. While Jimenez has had a hard life, including physical abuse during childhood, there is no evidence that these symptoms were present before her brain injury. Finally, treatment of these psychotic symptoms requires Jimenez to consume psychotropic drugs, which themselves have debilitating side effects. (2/4/02 Letter of Jennifer Brown to Court, Exh. C.)

The Guidelines provide that "[p]hysical condition ... is not *ordinarily* relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.4 (emphasis added). However, as with other such "discouraged" grounds for departure, a departure is permitted for physical impairment where such a factor is present "to an exceptional degree." *Koon v. United States*, 518 U.S. 81, 95–96, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Indeed, § 5H1.4 expressly recognizes that "an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range."

The Government argues, however, that such a departure is only warranted where a defendant's physical ailments are of such a nature or degree that they cannot "adequately ... be cared for by the Bureau of

Prisons." (11/20/02 Letter of AUSA Robin Linsenmayer to Court, at 2). Since the Bureau of Prisons provides a high standard of medical care, and stands ready to provide necessary and appropriate care for Jimenez (*see* 11/19/02 Letter of Barbara Cadogan, BOP Health Services Administrator, to AUSA Linsenmayer), the Government contends that a departure here is forbidden.

■ There is, however, no basis in law for the Government's contention. First, the specific language of § 5H1.4 not only fails to mention any such limitation, but appears expressly to reject it. The only example given in the Guidelines of circumstances in which a physical impairment would justify a departure is *not* one in which a prisoner's health would be threatened by the inability of prison authorities to provide adequate health care, but instead suggests a completely different rationale. The example instructs that departure would be warranted because "in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." U.S.S.G. § 5H1.4. This suggests a rather different, and penologically quite sound, rationale for departure. Where an extremely infirm defendant is so incapacitated that the ordinary purposes of incapacitation and deterrence of recidivism do not justify the expense of extended incarceration, some lesser degree of punishment is permissible, and indeed specifically authorized, by the Sentencing Commission.

The Government attempts to support its radical revision of the Guidelines' text by citation to Second Circuit authority, but the language it quotes is ripped from context, and the cases it cites are inapposite. Indeed, a close comparison of the actual cases with the Government's citation emphasizes the need for care in assessing over-enthusiastic arguments (whether from prosecutors or from critics of the Guidelines) that the Guidelines narrowly restrict a sentencing court's ability to depart. Casual citation of dicta in cases affirming sentencing judges' refusals to depart should not be permitted to grow gradually and unjustifiably into "law" that prohibits departure or restricts departures that the text of the Guidelines actually encourages.

The Government asserts that under Second Circuit law, "a touchstone for determining whether a particular impairment qualifies as 'extraordinary' is whether the impairment adequately can be cared for by the Bureau of Prisons." (2/20/02 Letter of AUSA Robin Linsenmayer, at 2.) The root of the line of authority supposedly supporting this proposition is *United States v. Altman*, 48 F.3d 96 (2d Cir.1995). The passage cited by the Government is, to begin with, completely dictum. Having reversed some of defendant's convictions, and remanded for resentencing, the Court of Appeals addressed a number of sentencing issues. With respect to a possible downward departure on health grounds, the defendant argued that the sentencing court had failed to recognize its power to depart on this ground. The Court of Appeals rejected the argument, noting that "the health problems cited by the defendant simply need monitoring, and Altman does not challenge the district court's finding that the Bureau of Prisons would be fully able to monitor his health. We can conclude that the district court did not consider Altman to have an extraordinary physical impairment." *Id.* at 104. Thus, in *Altman*, the Second Circuit's actual ruling was that the district court had recognized its authority to decline to depart, and had in fact declined to do so—leaving the Court without jurisdiction to address the merits of the departure application, which was in any event mooted by the reversal and remand for resentencing. Moreover, the Court did not purport to address the

circumstances under which a departure on health grounds would or would not be appropriate, merely noting that the district court had not found Altman's impairments "extraordinary" because they were monitorable. Indeed, the Court invited the district court "to consider the current state of Altman's health on resentencing." *Id.* The Court was not presented with, and did not address, the circumstances presented by this case, or by the example cited by the Commission in the text of § 5H1.4.

The Government cannot be blamed, perhaps, for misciting *Altman,* as the Second Circuit itself did the same in dictum in *United States v. Persico,* 164 F.3d 796 (2d Cir.1999). Here, again, the Court was not reviewing and rejecting a reasoned departure under § 5H1.4. Instead, it addressed an effort by one Fusco to withdraw his plea. Concluding that Fusco was really seeking to "renegotiate the length of [his] previously bargained-for sentence," the Court noted that the district court had properly concluded that its task was to decide whether to depart, in which case it would reject the plea bargain and impose a lower sentence. *Id.* at 806. However, the judge declined to depart and imposed the agreed sentence. Somewhat dubiously assuming that the refusal to depart was reviewable, the Court of Appeals held that the judge had "acted well within his discretion" in declining to depart. *Id.* Without addressing the nature of Fusco's physical impairments, or his reasons for suggesting they warranted departure, the Court simply noted that the "standards for a downward departure on medical grounds are strict," citing § 5H1.4 and *Altman,* and misdescribing *Altman* in a parenthetical squib as "holding that 'extraordinary physical impairment' . . . requires medical conditions that Bureau of Prisons is unable to accommodate." *Id.* A dictum mischaracterizing a previous dictum cannot establish a principle of law inconsistent with the text of the governing Guideline.

Finally, the Government cites *United States v. Martinez,* 207 F.3d 133 (2d Cir. 2000). At last, we have a case reversing a departure—that is, a case in which the Court of Appeals actually had jurisdiction to address the appropriateness of a departure, and found the district court beyond its authority. However, the departure in *Martinez* was not based on extraordinary physical impairment, but on "aberrant behavior." Indeed, the district court in *Martinez* had *declined* to depart for "extraordinary medical condition." *Id.* at 135. Applying the multifactor test of *Zecevic v. United States Parole Commission,* 163 F.3d 731 (2d Cir.1998), for aberrant behavior departures, the district court departed downward on this basis. Expressly noting that the appeal was "limited to the district court's application of *Zecevic,*" *Martinez,* 207 F.3d at 137, the Court of Appeals found that the district court had misapplied the test and wrongly granted the departure. The Court rejected the district court's reliance on Martinez's diabetes, noting that the *Zecevic* test "does not justify the open-ended consideration of every conceivable basis for a downward departure in applying the test," because the factors considered must be "relevan[t] . . . to the aberrant nature of the defendant's behavior." *Id.* at 139. The defendant's diabetes—hardly an extraordinary medical condition in and of itself on any theory— thus could not "justify a downward departure under *Zecevic* in this case." *Id.* The Court noted in passing the absence of evidence that Martinez's condition "could not be adequately cared for within the prison system," *id.,* citing *Altman,* which the Court then squibbed as "suggesting" that a defendant must have a condition that could not be cared for in prison to warrant a departure under § 5H1.4.

Contrary to the Government's view, law is not made by dictum and squib in cases dealing with facts and legal issues far dif-

ferent from those before the Court. What makes a physical impairment "extraordinary" for purposes of the Guidelines—as § 5H1.4 makes express in this instance—is whether it is an exceptional condition, of a type or to a degree not contemplated by the Commission in ruling that the normal variations of health and physical fitness among criminals are not ordinarily relevant to sentencing, whose severity bears in some way on the justifications for punishment.

In this case it is manifest that the defendant's condition meets that standard and warrants a departure. First, there is no question that Jimenez's physical condition is "exceptional," *Koon,* 518 U.S. at 95, 116 S.Ct. 2035, and that she is "seriously infirm," U.S.S.G. § 5H1.4. Unlike diabetes, Amnestic Disorder and psychotic hallucinations consequent on brain aneurism are not widespread, relatively easily-controllable medical conditions. Second, Jimenez's condition seriously erodes her capacity to threaten society. While the Government argues that Jimenez has failed to produce a "physician's evaluation, indicating that her ailment ... has impaired either her ability or her desire to engage in further

criminal conduct," 2/20/02 Letter of AUSA Linsenmayer at 3, the evaluation required is not a matter of medical expertise—such as the diagnosis and description of symptoms—but of legal judgment for the Court. It is hard to imagine Jimenez committing burglary, for example, or any crime of violence, in her present condition, or being able to undertake the rigors of illegal immigration yet again after being deported. Narcotics dealing may not take advanced education, but it is difficult to imagine a brain-injured, amnesiac, occasionally hallucinating individual, likely to suffer tremors and dizziness from her medication, having much success in that highly competitive field.

Accordingly, as § 5H1.4 teaches, this is a case where long-term imprisonment, which would otherwise be justified to protect the public, is wasteful and unnecessary.[1] This brings us to the question of the extent of the departure. Beyond question, some portion of the prison sentence recommended by the Guidelines in this case is based on rationales of incapacitation and special deterrence. As noted above, the guideline range is largely the product of Jimenez's extensive and serious

1. Of course, in determining whether this standard is met, it will often be relevant, though not always controlling, whether the Bureau of Prisons can provide adequate care. In many cases of physical impairment, the argument for departure is that the defendant's exceptional physical condition is relevant to punishment because the defendant's physical frailty will render confinement far more onerous for that defendant than it would otherwise be, or even that incarceration will have a fatal effect. If that is the argument, the authorities' ability to provide adequate medical care is highly relevant, because it will tend to rebut the claim that imprisonment will be unfairly dangerous or painful for the defendant. It is undoubtedly for this reason that Altman whose "health problems ... simply need monitoring" that the Bureau was fully able to provide, 48 F.3d at 104, or Martinez, whose diabetes was treatable by standard pro-

tocols easily provided in prison, were not entitled to departure. Even where the Bureau has generally adequate facilities for treatment of a disease, however, special circumstances may justify a departure on this ground. *See, e.g., United States v. Blarek,* 7 F.Supp.2d 192, 212–13 (E.D.N.Y.1998) (although Bureau provides appropriate care for prisoners with AIDS, defendant's precarious health and special treatment regime justify departure). At any rate, in the present case, the Bureau's ability to treat defendant's medical condition is not to the point, since her condition is relevant to the purposes of sentencing not because imprisonment will endanger her health, but because it reduces her danger to society and renders lengthy imprisonment, in the words of § 5H1.4, less "efficient" and more "costly" than necessary to meet the goals of punishment.

criminal record, which would ordinarily suggest imprisonment to rehabilitate (or at least deter) her and to keep her from committing crimes. To the extent that these rationales are inapplicable, because Jimenez is radically less likely to commit further crimes than the typical person with her past history, the sentence should be reduced. Unlike the example given in the Guidelines, however, this is plainly not a case for house arrest. While such a limited sanction might well be sufficient to keep Jimenez from committing further crimes "as efficient[ly], and less costly" than prison, U.S.S.G. § 5H1.4, that is not the only goal of punishment to be served by imprisonment here. Incarceration, perhaps unfortunately, is a primary signal in our society that a crime has been taken seriously. Moreover, the goal of general deterrence would be ill-served by a public perception that, even for extraordinary reasons, a person can repeatedly reenter the United States after deportation and commit crimes without being imprisoned for a meaningful period. Thus, a prison term is necessary to vindicate the law and provide deterrence. But the incapacitation that would otherwise be necessary, and that accounts in part for the high sentence provided in the guidelines, is not appropriate in this case, given the defendant's physical and mental infirmity.

Therefore, while the Court will hear argument on the subject from the Government and the defense as to the appropriate length of incarceration, it is the Court's expectation that a significant prison sentence, albeit one less than the guideline range of 57–71 months, will appropriately accomplish those goals of punishment— vindication of the law and general deterrence—that are applicable here, while recognizing that the extraordinary physical impairment of the defendant warrants a departure because it reduces, to an exceptional degree, the applicability of other rationales for punishment—incapacitation, specific deterrence, and rehabilitation— that would under normal circumstances justify, and that support the provision for, the recommended guideline sentence.

The Clerk is respectfully directed to docket copies of the letters of Jennifer Brown, dated February 4, 2002, and of AUSA Robin Linsenmayer, dated February 7 and 20, 2002, with all attachments and exhibits, as part of the permanent record of this case, to permit appropriate appellate review if such is sought by either party.

SO ORDERED: